**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JOE MICHAEL LUNA,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | **CIVIL NO. SA-15-CA-451-XR** |
| **v.** | § | |
| | § | **\* DEATH PENALTY CASE \*** |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Joe Michael Luna initiated this federal habeas corpus action pursuant to 28 U.S.C. § 2254 to challenge the constitutionality of his 2006 Bexar County conviction and sentence of death for the capital murder of Michael Andrade. Currently before the Court is Petitioner's Amended Petition for Writ of Habeas Corpus (ECF No. 22), as well as Respondent's Answer (ECF No. 30) and Petitioner's Reply (ECF No. 40) thereto. Having carefully considered the record and pleadings submitted by both parties, the Court concludes Petitioner is not entitled to federal habeas corpus relief or a certificate of appealability.

## I. <u>Background</u>

### A.      The Offense

In February 2005, Petitioner was staying with his girlfriend, Maria Solis, at The Hollows apartment complex in San Antonio, Texas. While there, Petitioner planned to burglarize several other apartments while the occupants were away by utilizing an attic crawl space that was accessible via Solis's apartment; however, upon further investigation, Petitioner found he could only access the neighboring apartment of Michael Andrade, a pre-med senior at nearby St.

Mary's University.  On February 17, 2005, Petitioner entered Andrade's apartment by using the attic crawl space to access Andrade's bedroom closet.  Petitioner thought the apartment was empty at the time and was surprised to find Andrade asleep in the bedroom when he entered.  Andrade, awakened by the sounds coming from his closet, was immediately confronted by Petitioner, dressed in a stolen black police SWAT uniform and ski mask, pointing a gun at him.  Petitioner forced Andrade to lie on the bed, tied him up with a cut-up bed sheet, and told Andrade that he would not hurt him and only wanted to rob him.  Petitioner then began collecting items from the apartment and placing them in his truck parked outside.

During the robbery, Petitioner began to worry that Andrade would speak to police and tell them that Petitioner entered from the attic, which would eventually lead them to Solis's apartment.  Petitioner decided he had to kill Andrade, so he got behind Andrade, put his arms around Andrade's neck, and strangled him to death.  Petitioner then attempted to cover his tracks by vacuuming Andrade's apartment and wiping for prints.  He also tried to burn down the apartment by setting small fires near the closet, the front door, and next to Andrade's body.  The fire did not destroy the apartment, however, because Petitioner had closed all of the doors and windows in the apartment and the fire eventually went out.

Petitioner became a suspect in Andrade's murder a few days later when the police received an anonymous tip on Crime Stoppers.  On February 21, 2005, Petitioner was arrested at Solis's apartment.  Police found Andrade's camcorder and car keys inside the apartment.  Police also found a stolen police vest, a black ski mask and gloves, a loaded .32 automatic handgun, a shotgun and shells, maps and information about Belize and Mexico, and notes about "going south."  In addition, fibers found inside a vacuum cleaner and on Petitioner's clothing were consistent with the insulation found in Andrade's attic and fibers from Andrade's bed sheet.

**B.     The Trial**

On January 5, 2006, Petitioner was indicted for the capital murder of Michael Andrade.  2 CR 258-59.[1]  At the commencement of his trial six weeks later, Petitioner entered a plea of guilty to the offense of capital murder as charged in the indictment.  13 RR 6.  Before accepting the plea, the trial court admonished Petitioner as to the consequences of his plea and then inquired whether defense counsel believed Petitioner had a rational and factual understanding of the proceedings against him.  13 RR 10-13.  Counsel responded affirmatively and indicated that, in his opinion, Petitioner was mentally competent to waive his rights and enter a guilty plea.  The parties then agreed to a unitary proceeding where both parties would submit evidence concerning Petitioner's punishment, after which the jury would be instructed to find Petitioner guilty and consider only the punishment phase special issues.  The jury then heard testimony from fifty-eight witnesses presented by the prosecution followed by three witnesses presented on behalf of the defense, including Petitioner.

1.     Evidence Presented by the State

The State began the proceedings by presenting several witnesses who testified regarding the discovery of Andrade's body and subsequent investigation into his murder.  13-14 RR.  These witnesses established for the jury the nature and circumstances of the crime.  The jury was then presented with evidence concerning Petitioner's escalating pattern of violence from the time he was fourteen years old until his incarceration for Andrade's murder at age twenty-five.

As a juvenile, Petitioner pulled a gun on his middle school principal on the first or second day of the seventh grade in September 1993, was expelled, and was placed on two years of intensive supervised probation with the Bexar County Juvenile Probation Department.  15 RR 3-

---

[1]     Throughout this opinion, "CR" refers to the Clerk's Record of Petitioner's trial while "RR" refers to the Reporter's Record.  Both are preceded by volume number and followed by the relevant page numbers.

23.  One of Petitioner's probation officers, Tony Martinez, testified that Petitioner displayed behavioral problems, assaultive behavior, and substance abuse issues.  *Id*. 24.  He was evaluated by Dr. J. O. Sherman in August 1994, who concluded Petitioner suffered from conduct disorder and substance abuse but did not have a thought disorder or major affective disturbance.  *Id*. at 33-35.  Petitioner was referred to several different treatment facilities for therapy and substance counseling but was discharged from each facility within weeks for either assaultive behavior or absconding.  *Id*. at 24-29.  As a result, Petitioner was committed to the Texas Youth Commission (TYC), a juvenile detention facility, in July 1995.  Petitioner was paroled twice from TYC but was revoked both times for failing to comply with the terms of his parole.  *Id*. at 30-32.  Petitioner was ultimately released from TYC in October 1997 when he turned eighteen.

The State then presented evidence that, as an adult, Petitioner carried out an almost unabated string of increasingly violent offenses leading up to Andrade's murder:

| | |
|---|---|
| December 1997 | Petitioner stole a 1996 Cadillac and later attempted to pawn golf clubs that had been in the car.  The owner of the car spotted it at the pawn shop and called his son, who then confronted Petitioner at the store.  A fight broke out, and police were dispatched to investigate and break up the fight.  The responding officer, Officer Juan Torres, was injured in the altercation and had to be sent to the hospital in an ambulance.  He later had to retire because of an injury he sustained while trying to detain Petitioner.  15 RR 54-72. |
| January 1998 | Petitioner stole a 1998 pink Z-28 Camaro.  A few days later, Petitioner stole a 1991 brown Pontiac four door, but was eventually spotted and pulled over by Officers Roy Naylor and Richard Schoenberger.  As the officers approached the vehicle, Petitioner tried to run one of them over while he fled the scene.  Less than half a mile down the road Petitioner lost control of the car and crashed into a phone pole.  He fled on foot, but was later apprehended.  Petitioner was arrested for assault of a public servant and unauthorized use of a vehicle.  15 RR 73-95, 110-19. |
| May 1998 | Petitioner was placed on probation for the above offenses and was assigned to sixty days in a Zero Tolerance Boot Camp.  Petitioner was also given six months of intensive supervision with the gang unit due to his membership in the "La Raza" street gang.  At the Boot Camp, Petitioner |

was disciplined for two separate altercations with other residents, and was eventually terminated from the program for absconding in July 1998. 15 RR 96-101.

July 1998    A week later, Petitioner broke into the apartment of Phillip Settles and his thirteen-year-old daughter. Settles was awakened in the middle of the night by his barking dog and found an individual jumping out of his daughter's bedroom window. Fingerprints taken at the scene were later matched to Petitioner. Petitioner's probation was revoked and he was convicted of burglary of a habitation, assault on a public servant, and three counts of unauthorized use of a vehicle. He received two five-year sentences for the first two counts and a two-year sentence for each of the unauthorized use counts. 15 RR 101-19.

March 2004    Petitioner was released from prison in August 2003. Six months later, Petitioner carjacked Candido Tovar at gunpoint in his work truck around three o'clock in the morning while Tovar was driving to work. Petitioner asked for money, but when he discovered Tovar did not have any, he forced Tovar to drive to a secluded area where Petitioner and his companions bound him with duct tape. The men left Tovar on his knees in the woods, but he was able to roll to the side of the road where someone eventually stopped to help him. 16 RR 9-34.

June 2004    Petitioner and his companions entered the home of Brooke Envick through the garage but left after her dog began to bark. That same night, the group broke into the home of Michael McGloughlin while he, his wife, and two-year-old daughter were asleep. McGloughlin awoke early in the morning to the sound of someone walking around upstairs. After finding someone in his home, McGloughlin ran back to the bedroom and tried to close the door, but the suspect knocked the door completely off its hinges and pointed a sawed-off shotgun at the family. The three suspects bound the adults with torn bedsheets while their daughter watched, then went about the house collecting items to take. The suspects took several items, including a computer, a camcorder, two cars, and the family dog. 16 RR 36-117.

A week later, Petitioner robbed Ruy D'Amico and his family at gunpoint in their home. D'Amico rose early in the morning to go to work and was confronted by Petitioner in the hallway pointing a silver handgun at his head. Petitioner gathered D'Amico and his family, made them lay face-down on the floor, and tied them up with torn bedsheets and duct tape. Similar to the previous robberies, the suspects then gathered various expensive items while the terrified victims prayed for their lives. The suspects then placed the stolen items in the D'Amico's car and left in it. 16 RR 118-186.

August 2004          Petitioner broke into the home of Jennifer Weise while she was asleep. She was awakened by the sound of creaking stairs but did not move from her bed as she heard someone enter her room. The person looked around and then left, but she stayed still until she heard the sound of her Dodge Durango leaving the garage. 17 RR 14-25.

December 2004        Just before Christmas Petitioner burglarized the home of Phillip Dreyer, a Lieutenant with the Bexar County Sheriff's Department,. Dreyer returned home from work around midnight to find his home ransacked and numerous work items stolen, including two rifles, two shotguns, ammunition, knives, a laptop, a bulletproof vest, two raid jackets, and a hazardous materials suit. Some of these items were later recovered in Maria Solis's apartment. 17 RR 26-34.

January 2005         Around a week later, Petitioner and a cohort robbed Vicky Calsada, her roommate, and her roommate's sixteen-year-old son at gunpoint. The two men were wearing all black, including ski masks, and were armed with shotguns. Again, the victims were forced onto the ground and tied up with torn bedsheets. The suspects stole jewelry, $2,900 in cash, and a handgun, as well as Calsada's puppy. The handgun was also recovered the following month in Maria Solis's apartment. 17 RR 35-52.

After hearing evidence concerning Petitioner's violent past, the jury was presented with evidence concerning Petitioner's behavior following his arrest for Andrade's murder in February 2005. Raymond Valero, a former cellmate of Petitioner's at the Bexar County Jail, testified that Petitioner confessed to him the details of Andrade's murder and expressed no remorse for the crime. Petitioner also told him that he had planned to use a shotgun to "shoot his way out" when police came to arrest him for Andrade's murder but that he did not have enough time to get to his gun. Petitioner also told Valero that he planned to marry Solis to prevent her from testifying against him and that he had a plan to use the judge as a "human shield" to escape if his trial did not go well. He also showed Valero a handcuff key he kept hidden in a bar of soap that was later recovered by Bexar County jailers. 17 RR 61-118.

Lastly, the State presented the testimony of Andrade's mother, father, sister, and college friend to demonstrate the devastating impact his murder had upon each of their lives. 17 RR 125-37; 18 RR 16-29. The State closed by presenting the jury with evidence that Petitioner had a

short-term sexual relationship with his fourteen-year-old neighbor in June of 2004 after she had run away from home. Petitioner—24 years old at the time—was aware of the girl's age. 18 RR 30-51.

2.      Evidence Presented by the Defense

Against the advice of counsel, Petitioner took the stand to testify on his own behalf. 18 RR 58-117. Petitioner began by saying he was testifying to set the record straight and was not there to plead for his life. Petitioner stated he was responsible for his circumstances and did not blame his childhood or believe there was anything mitigating about his past to warrant a life sentence. According to Petitioner, a death sentence would be appropriate for him, as a life in prison would only make him worse. Petitioner stated he pled guilty to get right with God and to give justice to Andrade's family.

On cross-examination, Petitioner admitted to murdering Andrade and described how the killing took place. Petitioner stated he felt no remorse after the murder and confessed to Maria Solis that he committed the robbery and murder because he was bored. Petitioner also admitted he had been given several chances to turn his life around but failed to take advantage of those opportunities. Petitioner testified he was guilty of all of the offenses enumerated by the State along with numerous other offenses unknown to law enforcement. In all, Petitioner estimated he had committed between 25-30 burglaries and aggravated robberies and also admitted to selling cocaine. According to Petitioner, he was addicted to the adrenalin rush of "going into a house when somebody was there and taking everything they owned." Petitioner finished by stating he knew the punishment for capital murder when he committed the crime and he was not trying to trick the jury into giving him a life sentence by asking for a death sentence.

Following Petitioner's testimony, the defense presented the testimony of Margaret Drake, a licensed clinical social worker and mitigation expert. 19 RR 3-33. In preparing a psycho-social report on Petitioner, she interviewed Petitioner on five occasions, met with his mother three or four times, and met with two of his aunts, his sister, and a former stepmother. She also reviewed Petitioner's TYC records. Ms. Drake testified that Petitioner moved around a lot as a child and had a very difficult upbringing. A number of Petitioner's family members abused drugs and alcohol and were abusive toward the children. There was also a history of mental health issues and criminal behavior in Petitioner's family. Petitioner's father had little involvement in his life, which led to a sense of rejection and alienation. Ms. Drake also testified that Petitioner was intelligent, likeable, and tended to do better during the times he was incarcerated at TYC and the Bexar County Jail. She admitted, however, that Petitioner had been given many chances for counseling and treatment to help him turn his life around but he ignored those opportunities and chose a life of crime instead.

Finally, the defense presented the testimony of Dr. Brian Skop, a clinical and forensic psychiatrist who evaluated Petitioner's potential for future danger just prior to his trial. 19 RR 34-54. As part of his evaluation, Dr. Skop reviewed Petitioner's TYC and TDCJ records as well as Petitioner's trial testimony. Dr. Skop determined Petitioner's I.Q. to be 89 and believed Petitioner suffers from anti-social personality disorder as well as some traits of borderline personality disorder and narcissistic personality disorder. Although he believed Petitioner would constitute a future danger if released back into society, Dr. Skop stated Petitioner would be less a danger if he were confined in prison. This is so partly because Petitioner's substance abuse problem would be lessened in prison due to treatment and decreased availability, and because prison is a controlled environment that could effectively control his impulsive behavior. Dr.

Skop also cited the fact that a person's risk of violence decreases as they age and Petitioner would have access to treatment for his mental disorders while incarcerated.

Following this testimony, on March 8, 2006, the trial court instructed the jury to return a guilty verdict on the issue of Petitioner's guilt or innocence. 20 RR 19-20. The jury was then instructed on the punishment special issues and heard closing argument by counsel. *Id*. at 21-50. After deliberations, the jury returned its verdict, finding unanimously (1) beyond a reasonable doubt there was a probability Petitioner would commit criminal acts of violence that would constitute a continuing threat to society, and (2) taking into consideration all of the evidence, including the circumstances of the offense, the Petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence. *Id*. at 53-54.

## C.     Post-conviction Proceedings

Petitioner appealed his conviction and sentence, raising twenty-five points of error in his direct appeal brief. In an opinion issued October 29, 2008, the Texas Court of Criminal Appeals (TCCA) affirmed Petitioner's conviction and sentence. *Luna v. State*, 268 S.W.3d 594 (Tex. Crim. App. 2008), *cert. denied*, 558 U.S. 833 (2009). The United States Supreme Court denied Petitioner's petition for writ of certiorari on October 5, 2009. *Luna v. Texas*, 558 U.S. 833 (2009).

While his direct appeal was still pending, Petitioner was appointed counsel—attorney Michael Gross—to represent him in pursuing state habeas corpus relief. In December 2008, Mr. Gross filed a state habeas application on Petitioner's behalf in the trial court raising a total of five claims for relief. These five claims were later fleshed out in a nearly three-hundred page

amended application filed by Mr. Gross in June 2009. Supp. SHCR at 1-297.[2] The state trial court held an evidentiary hearing on Petitioner's claims in November 2012, hearing testimony from several of Petitioner's family members as well as his two court-appointed trial attorneys, Michael Granados and Mario Trevino. The state trial court then issued its findings of fact and conclusions of law recommending that state habeas corpus relief be denied. I SHCR at 203-59. In an order dated April 22, 2015, the TCCA adopted all but three of the trial court's findings of fact and conclusions of law and denied Petitioner state habeas corpus relief. *Ex parte Luna*, No. 70,511-01, 2015 WL 1870305 (Tex. Crim. App. 2015).

One year following the denial of state habeas relief, Petitioner filed his initial federal habeas corpus petition in this Court (ECF No. 13) and amended the petition six months later on October 21, 2016 (ECF No. 22). Respondent answered the amended petition on June 19, 2017 (ECF No. 30), to which Petitioner has responded (ECF No. 40). This case is thus ripe for adjudication.

## II. Claims for Relief

As raised in Petitioner's Amended Petition (ECF No. 22), the following allegations are now before the Court:

1.  Petitioner received ineffective assistance of trial counsel by counsel's failure to investigate, develop, and present compelling mitigation evidence at the punishment phase of trial;

2.  Trial counsel were ineffective for failing to investigate Petitioner's experiences while incarcerated in TYC;

3.  The State violated *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois,* 360 U.S. 264 (1959) when it failed to disclose the horrific conditions Petitioner endured while incarcerated at TYC facilities and

---

[2]     Throughout this opinion, "SHCR" refers to the State Habeas Clerk's Record while "Supp. SHCR" refers to the Supplemental State Habeas Clerk's Record. Both are preceded by volume number and followed by the relevant page numbers.

presented false evidence that such facilities were rehabilitative and supportive;

4. The trial court violated Petitioner's due process rights by failing to conduct an adequate inquiry into his mental status despite information that raised doubts regarding his competency;

5. Trial counsel were ineffective for failing to investigate and present evidence of Petitioner's incompetency;

6. Petitioner's guilty plea was not knowing, intelligent, and voluntary;

7. Petitioner's absence from the courtroom for a critical proceeding when the trial court excused nearly a quarter of the venire panel off the record violated his Sixth, Eighth, and Fourteenth Amendment rights;

8. The trial court violated Petitioner's right to an impartial jury and due process by excluding two venire members for cause because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction;

9. Petitioner's due process rights were violated when the shackles he was wearing were specifically brought to the jury's attention by the bailiff and by the trial court's decision to continue shackling Petitioner during his own testimony;

10. Trial counsel were ineffective for failing to investigate and impeach prosecution witness Raymond Valero;

11. Trial counsel were ineffective for failing to object to the State's admission and recitation of Dr. J.O. Sherman's 1994 psychological report of Petitioner in violation of Petitioner's Sixth Amendment right to confront witnesses against him;

12. The trial court's ad hoc proceeding—in which the jury simultaneously considered evidence of Petitioner's guilt/innocence of the charged offense and his individual characteristics bearing on punishment—violated the Eighth and Fourteenth Amendments by failing to adequately guide the jury's discretion and ensure that Petitioner's death sentence was not arbitrarily or capriciously imposed;

13. Petitioner was denied his rights to due process and a jury trial when the jury failed to unanimously determine beyond a reasonable doubt the fact that exposed Petitioner to the punishment of death;

14. Petitioner was tried and sentenced to death under a statutory scheme that violates the Sixth, Eighth and Fourteenth Amendments in the following ways:

A.    Special Issue Number One [future dangerousness] is constitutionally vague and fails to adequately channel the jury's discretion or narrow the class of defendants sentenced to death;

B.    Special Issue Number Two [mitigation] is unconstitutional because it (1) instructs the jury that ten or more jurors must agree to a sentence of life, and (2) fails to require that the jury's findings on this issue be made beyond a reasonable doubt;

C.    Petitioner's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society; and

15.    The cumulative prejudicial effect of the above errors at both the guilt phase and punishment phase denied Petitioner due process of law and the effective assistance of counsel.

## III. <u>Standard of Review</u>

The standard of review a federal court applies depends on the state court's treatment of the federal claims. When claims have not been adjudicated on their merits by the state court, the federal court should apply a *de novo* standard of review to the claims. *Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014). If the claims were adjudicated on the merits, however, federal courts should apply the deferential standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254(d). Under this heightened standard, a writ of habeas corpus should be granted only if a state court's adjudication of a claim (1) resulted in a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or (2) resulted in a decision that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter*, 562 U.S. 86, 100-01 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102 (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

With regard to § 2254(d)(1), the Supreme Court has concluded the "contrary to" and "unreasonable application" clauses have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *(Terry) Williams v. Taylor,* 529 U.S. 362, 413 (2000). An "unreasonable application" occurs if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins*, 539 U.S. at 520-21. Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion. *Richter*, 562 U.S. at 102. Instead, a petitioner must show that the decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). So long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief. *Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show

that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

Through §§ 2254(d)(2) and (e)(1), the AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Similar to a state court's determination regarding clearly established federal law, a state court's factual determination is not unreasonable under § 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *(Terry) Williams*, 529 U.S. at 410 ("[A]n unreasonable application of federal law is different from an incorrect application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). In addition, § 2254(e)(1) supplements the deference afforded to state court factual determinations under § 2254(d)(2) by providing that a state court's determination of a particular factual issue "shall be presumed to be correct," and that a petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." *Wood*, 558 U.S. at 293; *Rice*, 546 U.S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'").[3]

Finally, the Fifth Circuit has held that a federal habeas court's review under AEDPA must focus exclusively on the ultimate decision reached by the state court and not evaluate the

---

[3] This standard, while "arguably more deferential" to state courts than the "unreasonable determination" standard of § 2254(d)(2), pertains only to a state court's determinations of particular factual issues. *Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 341-42 (2003)). On the other hand, § 2254(d)(2) pertains to a state court's decision as a whole. *Id*.

quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding a federal court is authorized by § 2254(d) to review only a state court's decision and "not on whether the state court considered and discussed every angle of the evidence"); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (holding that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning"). Indeed, state courts are presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)).

## IV. Analysis

**A.** **Several of Petitioner's Claims are Unexhausted and Procedurally Barred.**

As listed previously, Petitioner raises a total of fifteen allegations (not including subparts) in his amended federal petition. Respondent contends a majority of these allegations—claims 2, 3, 5, 6, 9, 10, 14(b)(2), 14(c), and 15, in particular—have not been presented to the Texas Court of Criminal Appeals for review either on direct appeal or during Petitioner's state habeas proceedings. Federal habeas relief is therefore precluded on these unexhausted allegations because they are considered procedurally defaulted.

1.      The procedural default doctrine

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.  *See* § 2254(b)(1)(A) (stating that habeas corpus relief may not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State").  The exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner.  *Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002).  In Texas, the highest state court for criminal matters is the TCCA. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  To properly exhaust a claim the petitioner must "present the state courts with the same claim he urges upon the federal courts."  *Picard v. O'Connor*, 404 U.S. 270, 276 (1971).

Petitioner readily admits he did not raise the instant claims in the TCCA, and, as such, those claims are unexhausted.  *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001).  However, if Petitioner were to return to state court to satisfy the exhaustion requirement and the state court would now find the claims procedurally barred, the unexhausted claims would be considered procedurally barred from federal habeas review.  *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9-10 (1992) (holding an unexhausted claim is procedurally defaulted for federal habeas purposes if the claim would now be procedurally barred by state court); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (same).

In this case, Petitioner is unable to return to state court to present any unexhausted claims because doing so would be barred by Texas' abuse of the writ doctrine codified in Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure.[4]  *Fuller v. Johnson*, 158 F.3d

_____

[4]      Article 11.071, Section 5(a) provides that a state court may not consider the merits of, or grant relief on, claims presented in a successive state habeas application unless the legal or factual issues were unavailable at the

903, 906 (5th Cir. 1998). The Fifth Circuit has consistently held that Texas' abuse of the writ doctrine is an independent and adequate state procedural bar foreclosing federal habeas review of unexhausted claims. *See Williams v. Thaler*, 602 F.3d 291, 305-06 (5th Cir. 2010) (holding a petitioner's claims were procedurally defaulted because if the petitioner returned to state court, the court would not consider the merits under Article 11.071, § 5(a)); *Rocha v. Thaler*, 626 F.3d 815, 832 (5th Cir. 2010); *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001). As a result, Petitioner's unexhausted claims are deemed procedurally defaulted in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004).

Federal habeas relief on the basis of a procedurally defaulted claim is barred unless the petitioner can demonstrate cause for the default and actual prejudice arising from the default or demonstrate the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Barrientes v. Johnson,* 221 F.3d 741, 758 (5th Cir. 2000). Petitioner makes no attempt to show a "fundamental miscarriage of justice" will result from the Court's dismissal of these claims. Instead, Petitioner repeatedly cites the Supreme Court cases of *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 569 U.S. 413 (2013) to establish that the alleged ineffectiveness of his post-conviction counsel constitutes cause to overcome the default. But as discussed below, Petitioner fails to make this showing.

2.    *Martinez* and *Trevino* are inapplicable to the instant proceedings.

Prior to *Martinez*, an attorney's negligence in a postconviction proceeding could not serve as "cause." *Coleman*, 501 U.S. at 755. *Martinez* and *Trevino* carved out a "narrow"

_____

time the previous application was filed or, but for a violation of the Constitution, no rational juror could have found the applicant guilty or voted in favor of a death sentence. As discussed previously in this Court's denial of Petitioner's request for stay and abatement (ECF No. 41 at 4), Petitioner freely admitted the majority of his unexhausted claims "could and should have been raised in state post-conviction proceedings," and provided no viable argument demonstrating the remainder of his claims were previously unavailable. The unexhausted claims would therefore be barred if Petitioner attempted to present them in a subsequent writ application in state court. *See* Tex. Code Crim. Proc. art. 11.071, § 5(a).

exception to the *Coleman* rule for claims asserting ineffective assistance of trial counsel (IATC). *Trevino*, 569 U.S. at 422. Now, a petitioner may meet the cause element by showing (1) "that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding" and (2) "that his [IATC claim] is substantial—i.e., has some merit." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). Neither of these is satisfied in this case.

The majority of Petitioner's defaulted claims are not eligible for the equitable exception created by *Martinez*. Although Petitioner argues throughout his amended petition that, under *Martinez*, state habeas counsel's failure to investigate and plead each of the unexhausted claims should constitute cause to excuse any default, *Martinez* is not a catchall excuse for the failure to first raise a claim in state court. Rather, *Martinez* is a "narrow exception" that applies only to IATC claims. *Martinez*, 566 U.S. at 9-18; *see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (declining to extend *Martinez* to claims alleging ineffective assistance of appellate counsel). The *Coleman* rule—holding that attorney negligence in post-conviction proceedings does not establish cause—thus still applies to every claim except IATC claims. *Id.* at 15. In other words, *Martinez* has no effect on any of Petitioner's allegations other than his three unexhausted IATC claims (claims 2, 5, and 10).

With regard to these IATC claims, however, Petitioner fails to establish that his habeas counsel—Mr. Gross—was "ineffective in failing to present those claims in his first state habeas proceeding." *Garza*, 738 F.3d at 676. In the habeas context, allegations of ineffective assistance are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Petitioner must demonstrate (1) counsel's performance was deficient, and (2) this deficiency prejudiced his defense. 466 U.S. at 687-88, 690. Petitioner contends Mr. Gross's inadequacies stem from his failure to raise each of the unexhausted claims

now presented in the amended federal habeas petition. But to establish deficient performance under *Strickland*, a petitioner must do more than identify issues or claims that habeas counsel did not raise and are now barred. *Id*. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."); *Smith v. Murray*, 477 U.S. 527, 535 (1986) ("[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."); *see also Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014) ("generalized allegations are insufficient in habeas cases" to meet the *Martinez* exception). Indeed, a state habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal" because "counsel cannot be deficient for failing to press a frivolous point." *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (unpublished) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

Furthermore, Petitioner has not shown that he was prejudiced by Mr. Gross's allegedly deficient performance—that is, "that there is a reasonable probability that he would have been granted state habeas relief had the claims been presented in the first state habeas application." *Barbee v. Davis*, 660 F. App'x 293, 314 (5th Cir. 2016) (unpublished); *Martinez v. Davis*, 653 F. App'x 308, 318 (5th Cir. 2016) (unpublished). The record in this case demonstrates that counsel raised five multifaceted and well-briefed allegations in his state habeas petition that were supported by affidavits from family, friends, and a psychologist he hired to evaluate Petitioner. Supp SHCR at 1-297, 406-419. With the heavy deference given to Mr. Gross's strategic choices under *Strickland*, Petitioner has not shown a reasonable probability that the state habeas court would have granted relief had counsel advanced his unexhausted claims, much less that the new claims had a better chance of success than the claims raised by state habeas counsel during

Petitioner's state habeas proceedings. Accordingly, Petitioner has not shown that state habeas counsel's representation was either deficient or prejudicial enough to provide cause to overcome the procedural bar of his unexhausted claims.

Finally, regardless of whether Petitioner establishes a valid claim of ineffective state habeas counsel under *Martinez*, he still is not entitled to excuse the procedural bar because the defaulted claims are also plainly meritless. Again, to overcome a default under *Martinez*, a petitioner must also demonstrate that the underlying IATC claim "is a substantial one." *Martinez*, 566 U.S. at 14 (citing *Miller-El*, 537 U.S. at 322). "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'" *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014) (quoting *Martinez*, 566 U.S. at 14). "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'" *Reed*, 739 F.3d at 774 (quoting *Martinez*, 566 U.S. at 15-16).

As discussed in greater depth in Section IV(E) below, Petitioner fails to meet this criteria as well. Consequently, Petitioner fails to establish cause under *Martinez* that would excuse his unexhausted IATC claims from being procedurally defaulted. Petitioner is thus barred from receiving federal habeas relief on these allegations.

**B.** ***Brady* and *Napue* (Claim 3)**

Petitioner contends the State suppressed evidence that TYC, where Petitioner was incarcerated for approximately three years as a juvenile, was dysfunctional and under investigation for widespread allegations of child sexual abuse. ECF No. 22 at 71-78. Petitioner also maintains the State presented false evidence at his trial that TYC was a supportive and rehabilitative institution and that Petitioner failed to take advantage of these rehabilitative opportunities. *Id*. at 78-81. Neither of these allegations was raised during Petitioner's direct

appeal or state habeas proceedings. Thus, as discussed in the previous section, both claims are procedurally barred from federal habeas relief.

To overcome this procedural bar, Petitioner invokes *Banks v. Dretke*, 540 U.S. 668 (2004) to establish cause for the default. Again, a federal court "may consider the merits of a procedurally defaulted claim if the petitioner shows 'cause for the default and prejudice from a violation of federal law.'" *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (quoting *Martinez*, 566 U.S. at 10). Under *Banks*, a petitioner can show "cause" for the default of a *Brady* allegation if "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." 540 U.S. at 691. To show prejudice, a petitioner must demonstrate that "the suppressed evidence is 'material' for *Brady* purposes." *See Rocha v. Thaler*, 619 F.3d 387, 394 (5th Cir. 2010). In other words, Petitioner must establish a valid *Brady* claim in order to overcome his procedural default and prevail on the merits. As discussed below, Petitioner fails to make this showing.[5]

1.     The *Brady* Allegation

In *Brady v. Maryland*, the Supreme Court announced that due process requires the State to disclose material, exculpatory evidence to the defense. 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, Petitioner must demonstrate (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to either guilt or punishment. *Banks*, 540 U.S. at 691; *Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985).

---

[5]     Petitioner fails to show that a finding of "cause and prejudice" under *Banks* would excuse the default of his false evidence claim under *Napue*. As those are separate legal issues, Petitioner's *Napue* allegation is procedurally defaulted regardless of the outcome of his *Brady* allegation.

Petitioner contends the State failed to disclose evidence that TYC was dysfunctional, riddled with administrative and accountability issues, and regularly abused the children in its care. Petitioner believes the State misled the jury by painting TYC as a rehabilitation facility when in fact "TYC was a place of chaos, disorder, and violence, which offered little in the way of rehabilitative possibilities to the juveniles it was supposed to serve." ECF No. 22 at 62, 76. But Petitioner also asserts that evidence of TYC's alleged dysfunction was public information that "had been well known as far back as 2003." *Id.* at 62, 64. He even supports this assertion with a declaration from his trial attorney and a report from an expert on juvenile justice in Texas. ECF No. 23-1 at 32 (Declaration from attorney Mario Trevino stating that the problems at TYC "had been publically known" prior to Petitioner's trial); ECF No. 23-2 at 67 (Report of Dr. William Bush acknowledging "the problems and failures of TYC were known to the public in broad strokes" at the time of Petitioner's trial). If such evidence was indeed widely known as Petitioner asserts, it was also available to the defense and thus not suppressed within the meaning of *Brady*. *See Woodford v. Cain*, 609 F.3d 774, 803 (5th Cir. 2010) (stating "there can be no viable *Brady* claim when allegedly suppressed evidence was available to the defendant through his own efforts"); *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997) (same).

Petitioner also contends the prosecution was aware of the massive child sexual abuse scandal at TYC and the subsequent investigation by the Texas Rangers but failed to disclose this potential *Brady* material to the defense. According to Petitioner, Bexar County prosecutors had knowledge of the scandal because the Texas Rangers produced a report on the scandal that was apparently seen by the Texas Attorney General's Office as well as by certain individuals at TYC and in the Ward County District Attorney's Office. ECF No. 40 at 31-33. But again, Petitioner concedes that the scandal and subsequent investigation became public news shortly after the

investigation began in February 2005, a year before Petitioner's trial. Accordingly, evidence of the sexual abuse scandal was available to the defense through the use of reasonable diligence, thus negating the *Brady* allegation. *See Castillo v. Johnson*, 141 F.3d 218, 223 (5th Cir. 1998) ("Under *Brady*, the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of diligence."); *Brown v. Cain*, 104 F.3d 744, 750 (5th Cir. 1997) (same).

Alternatively, if the sexual abuse scandal was not public knowledge, Petitioner cannot establish a valid *Brady* claim because there is no evidence that Bexar County prosecutors were aware of the scandal and subsequent investigation. Petitioner correctly notes that knowledge of potential *Brady* material is imputed to prosecutors if a member of the prosecution team has knowledge of the *Brady* material. *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) (citations omitted). Contrary to his assertion, however, a prosecutor's office is not automatically imputed with knowledge of an investigation by state law enforcement officials simply by virtue of being a governmental agency. Instead, that determination is made on a "case-by-case analysis of the extent of interaction and cooperation between the two governments." *Id*. In this case, no evidence has been presented indicating that the Bexar County District Attorney's Office had any interaction or cooperated in any way with the investigation by the Texas Rangers. Nor has Petitioner presented evidence establishing that Bexar County had knowledge of the subsequent report created by the Texas Rangers that was distributed to other governmental agencies.[6] Because Petitioner provides no evidence that the prosecution in his case suppressed evidence within the meaning of *Brady*, his claim fails. *See Murphy v. Johnson*, 205 F.3d 809, 814 (5th

---

[6] Although the prosecution did present the testimony of Juan DeLeon (15 RR 46-54), a Parole Officer with TYC who supervised Petitioner's parole in 1996, Respondent correctly points out that DeLeon's employment with TYC does not establish that he had any knowledge of the Texas Rangers' investigation or subsequent report. Even if he did have some knowledge, it would not be imputed to the prosecution. *See Hill v. Johnson*, 210 F.3d 481, 488-89 (5th Cir. 2000) (suggesting that merely testifying as an expert witness for the State does not necessarily transform an expert witness into an "arm of the state").

Cir. 2000) (finding petitioner is not entitled to habeas relief based on conclusory and speculative allegations of a *Brady* violation).

Regardless, even assuming Petitioner can establish the above evidence was suppressed, the Court concludes it was not material. Again, suppressed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 685. However, "[i]f the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality." *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005). "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Rocha*, 619 F.3d at 396 (quoting *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004)).

Petitioner contends the evidence of TYC's scandal would have had substantial value by "conveying to the jury the troubled, traumatic upbringing [he] had endured, including the time he spent as a ward of the State of Texas." ECF No. 40 at 34. Yet, Petitioner does not allege to have witnessed any such abuse during his time at TYC or contend that he was the victim of such abuse. Thus, evidence of a sexual abuse scandal at TYC in and of itself would seem to have only incremental value, at best, and does not rise to the level of *Brady* materiality. The value of such evidence is further diminished when considering Petitioner took the stand and testified before the jury that he did not blame the circumstances of his childhood or the way he was raised for his actions. 18 RR 59-117. Petitioner agreed that TYC offered him numerous opportunities to turn his life around but he failed to take advantage of them, admitted to committing numerous violent felonies both known and unknown to the prosecution, and asked the jury to give him the death penalty because he knows he is a future danger and that no mitigating evidence warranted a life sentence. *Id.*

In addition, the jury heard evidence concerning the cold nature of Andrade's murder, including Petitioner's own confession to the crime and the effect it has had on Andrade's family and friends. *See* Section I(B), *supra*. The jury also heard from numerous victims and investigators about Petitioner's ever-escalating pattern of violence that culminated in Andrade's murder in addition to hearing about Petitioner's inability to reform his conduct while incarcerated as both a juvenile and adult. Thus, given the overwhelming nature of the evidence presented by the State at punishment, Petitioner fails to establish the result would have been different had the State disclosed the TYC scandal and investigation prior to trial. *Bagley*, 473 U.S. at 685. Relief is therefore denied.

2.    The *Napue* allegation

In a related allegation, Petitioner contends the State presented false evidence that he was given multiple chances to turn his life around through counseling and drug treatment at TYC but failed to take advantage of these opportunities. In *Napue v. Illinois*, the Supreme Court held that a criminal defendant is denied due process when the State knowingly uses perjured testimony or allows false testimony to go uncorrected at trial. 360 U.S. 264 (1959); *see also Giglio v. United States*, 405 U.S. 150 (1972). A petitioner seeking to obtain relief on such a claim must show that (1) the testimony is false, (2) the State knew that the testimony was false, and (3) the testimony was material. *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *Pyles v. Johnson*, 136 F.3d 986, 996 (5th Cir. 1998).

Citing the testimony of Tony Martinez, one of Petitioner's juvenile probation officers, Petitioner argues the jury was misled about the rehabilitative opportunities he was offered while incarcerated at TYC. According to Petitioner, the testimony omitted certain facts known by the State—namely, that TYC "was a jail for children focused on punishment rather than

rehabilitation" which was plagued by rampant physical and sexual abuse. ECF No. 22 at 76. But despite asserting the State gave the wrong impression, one that could have been corrected with evidence of TYC's dysfunction and abuse scandals, Petitioner has not shown that any witness's testimony was actually false. Martinez testified generally that the goal of probation for juveniles was rehabilitation, but if they are incarcerated or their probation is revoked, they are sent to TYC, a juvenile detention facility. 15 RR 17-22. He then testified about Petitioner's placement in several residential treatment facilities, and that each time Petitioner was expelled within a few weeks for behavioral issues. *Id*. at 22-33. This evidence is neither misleading nor false and was supported by Petitioner's own testimony and that of his mitigation expert, Margaret Drake. 18 RR 73-74; 19 RR 29-30. Moreover, for the reasons previously discussed, the testimony was largely immaterial given the overwhelming nature of the evidence presented by the State at punishment. Relief is therefore denied on Petitioner's *Napue* claim.

## C.     **The Guilty Plea** (Claim 6)

Petitioner next contends his guilty plea was not knowing, voluntary, and intelligent because it was the result of mental illness and brain damage. Specifically, Petitioner states his mental health issues—Post-traumatic Stress Disorder (PTSD), depression, and suicidality—and the organic brain damage he developed as a juvenile impeded his ability to make a voluntary and rational decision. Petitioner did not raise this claim during his state court proceedings and is therefore procedurally barred from federal habeas corpus relief. *See* Section IV(A), *supra*. Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice in order to overcome this procedural bar. Regardless, even when reviewed under a *de novo* standard of review, Petitioner's claim lacks merit.

A guilty plea is valid only if entered voluntarily, knowingly, and intelligently, "with sufficient awareness of the relevant circumstances and likely consequences." *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005). To be voluntary, a plea must not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant." *Austin v. Davis*, 876 F.3d 757, 783 (5th Cir. 2017) (citing *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000)). To be knowing and intelligent, a defendant must have "real notice of the true nature of the charge against him." *Bousley v. United States*, 523 U.S. 614, 618 (1998) (internal quotation marks omitted); *see also Ables v. Scott*, 73 F.3d 591, 592 n.2 (5th Cir. 1996) (finding that knowing the consequences of a guilty plea means only that the defendant knows "the maximum prison term and fine for the offense charged"). When determining whether a plea is voluntary, knowing, and intelligent, a court should consider all relevant circumstances, including whether the defendant: (1) had notice of the charges against him; (2) understood the constitutional protections he was waiving; and (3) had access to competent counsel. *Austin*, 876 F.3d at 783; *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).

Petitioner does not allege that his guilty plea was the result of any force, threat, or coercion. Instead, he contends his mental health issues and organic brain damage hindered his ability to make a voluntary and rational decision. Other than the unexhausted reports from experts who evaluated Petitioner ten years after his trial, however, Petitioner provides little persuasive evidence he suffers from either PTSD or brain damage. ECF No. 23-2 (reports of Dr. Pablo Stewart and Dr. Barry Crown). And the assertion that he suffered from depression and suicidality at the time of his trial appears to derive mostly from the fact that Petitioner pled guilty and sought the death penalty during his testimony, ECF No. 22 at 96, an idea that was directly rebutted by Petitioner's own expert on direct examination. *See* 19 RR 42 (stating Petitioner

sought the death penalty because he did not want to be in prison the rest of his life, not because "he's suffering from a major depression or anything, or he's suicidal").

Even assuming Petitioner suffered from brain damage and mental illness, those facts alone would not render him incompetent to plead guilty. *See Austin*, 876 F.3d at 780 ("A history of suicidality and depression . . . does not render a defendant incompetent to plead guilty.") (citations omitted); *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013) (finding "the presence or absence of mental illness or brain disorder is not dispositive" as to competency). Nor would it render his guilty plea invalid.

The record in this case indicates Petitioner's plea was a voluntary and intelligent choice. Before accepting his guilty plea, the trial court admonished Petitioner regarding the following consequences of his plea: (1) only two punishments were available—a life or death sentence; (2) all non-jurisdictional defects in his proceeding would be waived; and (3) the jury would be instructed to find him guilty and would then decide which punishment would be assessed. 13 RR 10-13. Petitioner responded "I understand" to each of the admonishments given by the trial court and indicated that his plea was voluntary and not the result of any threats, coercion, or promises. *Id*. The trial court also asked defense counsel whether, in his opinion, Petitioner had "a rational and factual understanding of the proceedings," if he was able "to assist in the preparation of any possible defenses," and if he was "mentally competent" to waive his rights and enter a guilty plea. *Id*. at 11-12. Counsel responded unequivocally "yes" to each of these questions. *Id*.

Petitioner clearly demonstrated an understanding of the charges against him and the possible consequences, as well as an ability to make strategic choices and to communicate clearly with counsel and the trial court. Petitioner's formal declarations in open court during his

plea proceedings carry a strong presumption of verity and constitute a formidable barrier to any subsequent collateral attack. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *United States v. Kayode*, 777 F.3d 719, 729 (5th Cir. 2014). "The subsequent presentation of conclusory allegations which are unsupported by specifics is subject to summary dismissal." *Blackledge*, 431 U.S. at 74. Petitioner has not provided sufficient evidence or argument to overcome this strong presumption, much less establish that his guilty plea was an involuntary and irrational decision. The Court would therefore deny relief *de novo* even if it were not barred by the procedural default doctrine.

**D.    Competency (Claim 4)**

Petitioner next asserts he was deprived of due process by the trial court's failure to conduct an adequate inquiry into his competency as required by *Pate v. Robinson*, 383 U.S. 375 (1966). Under *Pate*, a trial court must hold a competency hearing when there is evidence before the court that objectively creates a bona fide question as to whether the defendant is competent to stand trial. 383 U.S. at 385. Petitioner contends that, despite ample evidence that raised questions about his competency, the trial court failed to order a mental health evaluation or competency hearing in violation of his due process rights. This allegation was rejected by the TCCA during Petitioner's direct appeal proceedings. *Luna*, 268 S.W.3d at 598-600. Relief is now denied in federal court because the state court's adjudication was neither contrary to nor an unreasonable application of *Pate*.

1.    Background

The trial court inquired into Petitioner's competency on three different occasions during Petitioner's trial. The facts surrounding these inquiries were adequately summarized by the TCCA on direct appeal:

The trial court inquired about [Petitioner]'s competency several times during the proceedings. When [Petitioner] initially pleaded guilty to the charges in the indictment, the trial court admonished him of the consequences of his plea. [Petitioner] stated that he understood the admonishments, that his plea was not the result of threats or promises, and that he was satisfied with the assistance of defense counsel. The trial court asked defense counsel if [Petitioner] had "a rational and factual understanding of the proceedings," if he was "able to assist in the preparation of any possible defenses," and if he was "mentally competent" to waive his rights and enter a guilty plea. Defense counsel replied to all of these questions in the affirmative.

[Petitioner] later testified at trial, against the advice of defense counsel. Outside the presence of the jury, defense counsel questioned [Petitioner] about his decision to testify and his awareness of the consequences of doing so. [Petitioner] repeatedly indicated an understanding of the consequences of his decision to testify. The trial court asked defense counsel if he believed that [Petitioner] had "a rational and factual understanding of the proceedings" and was "mentally competent" to waive his Fifth Amendment rights and to testify in front of the jury. Defense counsel replied in the affirmative. The trial court also questioned [Petitioner], who said that he understood his Fifth Amendment right not to testify and the consequences of waiving that right. He also acknowledged that no one threatened him or coerced him to testify.

The trial court again inquired about [Petitioner]'s competency prior to closing arguments, when [Petitioner] consented to the seating of an alternate juror. Defense counsel stated that he was not in favor of seating the alternate juror because she was, in his opinion, "extremely pro-death sentence." The trial court then questioned defense counsel and [Petitioner] as follows:

> THE COURT: [Defense counsel], are you confident that your client—I've asked this before, but as to this issue—has a rational and factual understanding of the issues we're dealing with this morning?
>
> [DEFENSE COUNSEL]: He does. There's no doubt about that. I think Doctor Skop has testified, also, as to his mental condition.
>
> THE COURT: And in your opinion is he mentally competent at this time to be able to make that type of a decision?
>
> [DEFENSE COUNSEL]: Yes, he is.
>
> * * *
>
> THE COURT: Right. [Petitioner], do you understand everything we've done up here?

30

[PETITIONER]:  I understand.

THE COURT:  Do you have any questions about anything we've gone over?

[PETITIONER]:  No.

THE COURT:  Were you able to effectively communicate with your attorney this morning regarding not only the issue of the lawyer—or the juror's being ill this morning, but the issues related to the alternate and her feelings on the death penalty?

[PETITIONER]:  I did.

THE COURT:  Do you have any questions?

[PETITIONER]:  No.

*Luna*, 268 S.W.3d at 599-600.

2.     Analysis

Petitioner contends that the above inquiries were insufficient to reasonably assess his competency because the trial court made no attempt to determine the motivation behind his decision to plead guilty or the status of his mental health.  According to Petitioner, there was ample evidence of his incompetency available to the trial court, including his "surprise" guilty plea, his failure to follow counsel's advice, the contents of his testimony, and his history of depression, suicidality, possible mental illness, substance abuse, and limited functioning.  To obtain relief on a *Pate* procedural due process allegation, a petitioner does not have to establish he was incompetent[7] to stand trial; rather, he need only establish that the trial judge should have ordered a hearing to determine his competency.  *Roberts v. Dretke*, 381 F.3d 491, 497 (5th Cir. 2004).  The inquiry is whether the trial judge received information which, objectively

---

[7]     The Supreme Court has explained that the two-part test for competence is (1) whether a defendant has "a rational as well as factual understanding of the proceedings against him;" and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."  *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (citing *Dusky v. United States*, 362 U.S. 402 (1960)).

considered, "should reasonably have raised a doubt about the defendant's competency and alerted [the court] to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense." *Id.* (quoting *Lokos v. Capps,* 625 F.2d 1258, 1261 (5th Cir. 1980)).

Although the Supreme Court has not articulated a general standard for the nature or quantum of evidence necessary to trigger a competency hearing, it has focused on three factors that should be considered: (1) the existence of a history of irrational behavior; (2) prior medical opinions; and (3) the defendant's bearing and demeanor at the time of trial. *United States v. Flores-Martinez*, 677 F.3d 699, 706–07 (5th Cir. 2012); *Williams*, 819 F.2d at 607. Petitioner carries the burden of showing, by clear and convincing evidence, that a *Pate* violation occurred. *Wheat v. Thigpen*, 793 F.2d 621, 629 (5th Cir. 1986). Petitioner fails to meet this burden.

a.     Irrational Behavior

Petitioner asserts his decision to "unexpectedly" plead guilty constitutes evidence of his incompetency. Petitioner argues the unexpected nature of the plea indicates an irrational and impulsive decision that was contrary to his best interests. The record does not support this assertion. To the contrary, Petitioner's own testimony indicates the decision to plead guilty was not a "spur of the moment thing" and was made "quite a while back." 18 RR 74. Petitioner explained that he had communicated this decision to his family prior to the beginning of trial. *Id.* Trial counsel was aware of the decision for at least two or three days prior to trial and met with Petitioner several times to try to persuade him otherwise. 1 SHCR at 498-99.

Petitioner contends that his failure to follow counsel's advice should also have raised a doubt as to his competency. But the fact that Petitioner chose not to follow counsel's advice or disagreed with his defense team does not necessarily indicate an inability to understand the

proceedings or consult with his attorneys. *See United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011) (finding a defendant is not incompetent "merely because he refuses to cooperate [with counsel]"). Moreover, the fact that counsel disagreed with this decision or that the Petitioner's decisions were "motivated by [his] desire to obtain a death sentence" is largely irrelevant. This Court's focus is not on Petitioner's legal acumen, but whether there was sufficient information before the trial court that, objectively considered, should have raised a doubt about his competency. *Roberts*, 381 F.3d at 497. The Fifth Circuit has expressly "decline[d] to adopt a per se rule that, as a matter of law, a trial court must doubt a capital punishment defendant's competency, or conclude that such defendant does not understand the proceedings against him or appreciate their significance . . . simply because it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty." *Id*. at 498. Thus, the fact that Petitioner, contrary to counsel's advice, chose to plead guilty and request a death sentence is not evidence that he may be incompetent to stand trial or that the trial court should have held a competency hearing.

    b.  <u>Prior Medical Opinion</u>

   Petitioner next argues the trial court should have been aware of "red flags" that called his competency into question, including his history of possible mental illness, depression, suicidal ideation, substance abuse, and limited intellectual functioning. Yet, the only medical opinion before the trial court was the testimony of Dr. Skop, who testified that Petitioner's I.Q. was 89 and that "it doesn't appear that [Petitioner] is suffering from a major depression or anything, or suicidal." Petitioner fails to demonstrate that he suffered from any mental health issue that would prevent him from understanding the proceedings, much less that such evidence was before the trial court and should have triggered a more substantive inquiry into his mental status.

Even assuming Petitioner suffered from depression and mental health issues at the time, such issues do not necessarily raise an objective doubt as to his competency because "the presence or absence of mental illness or brain disorder is not dispositive" as to competency. *United States v. Mitchell*, 709 F.3d 436, 440 (5th Cir. 2013) (citing *Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000)); *see also Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003) ("Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.") (citation omitted). Likewise, Petitioner's substance abuse issues would not require a hearing because evidence of drug addiction does not by itself require a finding of incompetency. *Holmes v. King*, 709 F.2d 965, 968 (5th Cir. 1983).

c.      Demeanor at Trial

Finally, Petitioner cites his "bizarre and sometimes rambling" testimony at trial as evidence of his potential incompetency, arguing that the damaging testimony evinced a desire to ensure his own death. Although Petitioner clearly stated his desire was for the jury to sentence him to death, his testimony articulating the reasons for this request was anything but irrational. Petitioner stated that he had found religion in prison and a sentence of death would help him focus on God and prevent him from hurting others. He further explained that his decision to plead guilty was the result of his desire to "turn [his] life over to God" and to give justice to the family of his victim. He also did not want to spend the rest of his life in prison because it would just make him a worse person, whereas a death sentence would enable him to focus his attention "on getting strengthened spiritually" without getting sidetracked. Thus, far from being impulsive or irrational, Petitioner's testimony demonstrated coherent and well-reasoned explanations for choosing to plead guilty, testify on his own behalf, and seek the death penalty as punishment.

Nothing about Petitioner's testimony raised a doubt about his competency or ability to understand the proceedings. *Roberts*, 381 F.3d at 497.

Perhaps more significantly, neither of Petitioner's counsel (Michael Granados and Mario Trevino) raised the issue of competency prior to trial or expressed concern about Petitioner's ability to communicate or understand the proceedings against him. To the contrary, on several occasions counsel expressed the opinion that Petitioner was mentally competent to waive his rights and enter a plea. 13 RR 11; 18 RR 54; 20 RR 7. As trial counsel is often the best source of information about a defendant's competency, this failure to raise any sort of issue concerning Petitioner's competency is persuasive evidence in and of itself that no violation occurred. *Medina v. California*, 505 U.S. 437, 450 (1992); *Reese v. Wainwright*, 600 F.2d 1085, 1092 (5th Cir. 1979). Thus, Petitioner's testimony did not indicate a lack of rationality, understanding, or ability to communicate that should have alerted the trial court to potential competency issues.

In sum, this Court's review of each of the three factors to be considered under *Pate* indicates that no bona fide question as to Petitioner's competency existed that would warrant a competency hearing. Petitioner fails to establish that the state court's rejection of this claim was unreasonable. Relief is therefore denied.

E.      **Trial Counsel Claims (Claims 1, 2, 5, 10, and 11).**

Petitioner raises several IATC claims asserting that his trial counsel were ineffective prior to or during Petitioner's sentencing proceeding. Two of these allegations—that counsel failed to investigate and present mitigating evidence (Claim 1) and that counsel failed to object to the report of Dr. J. O. Sherman (Claim 11)—were raised and rejected during Petitioner's state habeas proceedings. As discussed below, Petitioner fails to demonstrate the state court's

rejection of the claims was contrary to, or an unreasonable application of, Supreme Court precedent.[8]

The remainder of Petitioner's IATC claims allege: counsel failed to investigate Petitioner's experiences in TYC (Claim 2); counsel failed to investigate and present evidence of Petitioner's incompetency (Claim 5); and that counsel failed to properly impeach Raymond Valero (Claim 10). Petitioner has not exhausted these claims in state court and they are therefore procedurally barred from federal habeas review. *See* Section IV(A), *supra*. Although he references *Martinez* and *Trevino* to establish cause to excuse the procedural default, as discussed below, Petitioner fails to show the underlying IATC claims are substantial. Even when reviewed under a *de novo* standard, Petitioner's IATC claims lack merit. Relief is therefore denied on each claim.

1.    The *Strickland* Standard of Review

IATC claims are reviewed under *Strickland*'s familiar two-prong test requiring a petitioner to demonstrate counsel's performance was deficient and this deficiency prejudiced his defense. 466 U.S. at 687-88, 690. According to the Supreme Court, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017). "To demonstrate deficient performance, the defendant must show that, in light of the circumstances

---

[8]    Petitioner contends this Court should not apply AEDPA's presumption of correctness to the state habeas court's factual findings because the state court's order was largely a verbatim adoption of the State's proposed findings and conclusions. ECF No. 22 at 16-17. In another context, the Supreme Court has criticized the "verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *see also Jefferson v. Upton*, 560 U.S. 284, 294-95 (2010) ("Although we have stated that a court's verbatim adoption of findings of fact prepared by prevailing parties should be treated as findings of the court, we have also criticized that practice.") (quotation omitted). The Fifth Circuit, however, has rejected the argument that habeas findings adopted verbatim from those submitted by the State are not entitled to deference. *See Basso v. Stephens*, 555 F. App'x 335, 342, 343 (5th Cir. 2014) (unpublished); *Green v. Thaler*, 699 F.3d 404, 416 n. 8 (5th Cir. 2012).

as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687-88). This requires the Court to "affirmatively entertain the range of possible 'reasons . . . counsel may have had for proceeding as they did.'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). As such, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quoting *Strickland*, 466 U.S. at 690).

To satisfy *Strickland*'s second prong, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. In conducting a *Strickland* prejudice analysis, a court must "consider all the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam). However, the question "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111-12 (emphasis added) (citing *Wong*, 558 U.S. at 27). Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id*.

Finally, where the IATC claims raised by Petitioner were adjudicated on the merits by the state court, this Court must review these claims under the "doubly deferential" standards of both *Strickland* and Section 2254(d). *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing

*Pinholster*, 563 U.S. at 190); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (same). Such claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). In reviewing these claims, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards, but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101. That is to say, the question to be asked in this case is not whether counsel's actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.

### 2. The Mitigation Investigation (Claims 1, 2)

Petitioner's first two claims for relief allege that trial counsel were ineffective for failing to investigate and present mitigating evidence to the jury. In his first allegation, Petitioner contends counsel failed to discover and present evidence of his dysfunctional, abusive, and chaotic childhood, or evidence of the brain damage, PTSD, and depression that resulted from this upbringing. This allegation was raised and rejected during Petitioner's state habeas corpus proceedings,[9] and Petitioner fails to demonstrate that this adjudication was contrary to, or an unreasonable application of, clearly established federal law.

In Petitioner's second claim for relief, he raises a similar allegation—that counsel's mitigation investigation was deficient because they did not properly investigate his experiences in TYC to refute the notion that TYC was a supportive and rehabilitative institution. Had they

---

[9]      Although Petitioner's allegation was raised during his state habeas proceedings, Petitioner attempts to bolster the claim in federal court with several new exhibits that were not presented to the state court. Because Petitioner "must overcome the limitation of § 2254(d)(1) on the record that was before that state court," this Court will not consider this evidence as it pertains to Petitioner's first claim. *Pinholster*. 563 U.S. at 181-82. Petitioner also attempts to bolster the claim with a new allegation concerning counsel's failure to discover evidence of "organic brain damage" that was not presented to the state court. But claims are not exhausted "if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). Thus, for the reasons discussed in Section IV(A), *supra*, Petitioner's allegation is unexhausted and procedurally defaulted to the extent it raises this new assertion.

done so, Petitioner attests, counsel could have presented evidence that TYC was a place of "chaos, disorder, and violence, which offered little in the way of rehabilitative possibilities" to rebut the State's "false characterization" that Petitioner failed to take advantage of the opportunity for rehabilitation while at TYC. This allegation was not presented to the state court and is therefore procedurally barred from federal habeas relief. Aside from the procedural bar, the claim lacks merit for the reasons discussed below.

In preparing for the penalty phase of a death penalty trial, "counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). However, lawyers generally need not go "looking for a needle in a haystack," especially when they have "reason to doubt there is any needle there." *Maryland v. Kulbicki*, 136 S. Ct. 2, 4-5 (2015) (per curiam) (citing *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)). Instead, counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 522. When the alleged omission is failure to investigate something in particular, a court must look at "the known evidence" and whether it "would lead a reasonable attorney to investigate further." *Id.* at 527.

In reviewing such claims, it is important to remember that counsel's performance need not be optimal to be reasonable. *Richter*, 562 U.S. at 104; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) (finding a defendant is entitled to "reasonable competence, not perfect advocacy"). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110. For

this reason, every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Accordingly, there is a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689)).

The record in this case supports the state court's conclusion that Petitioner's trial counsel conducted a very thorough mitigation investigation into Petitioner's background and childhood. I SHCR at 254. To assist in the investigation, counsel obtained two experts: Margaret Drake, a licensed clinical social worker and mitigation expert, and Dr. Brian Skop, a clinical and forensic psychiatrist. During her investigation, Ms. Drake interviewed Petitioner several times, met with his mother three or four times, and met with two of his aunts, his sister, and a former stepmother. Ms. Drake then testified about the results of her investigation, which included most of what Petitioner now faults counsel for failing to uncover. 19 RR 3-33. For instance, Ms. Drake testified about Petitioner's difficult upbringing and exposure to substance abuse, violence, instability, criminal behavior, neglect, rejection by his father, and family members with mental health issues. *See* Section I(B), *supra*. Although no *further* evidence was presented on these issues, any additional testimony regarding Petitioner's chaotic childhood would only have been cumulative of evidence already presented at trial. *Parr v. Quarterman*, 472 F.3d 245, 258 (5th Cir. 2006).

The record also demonstrates that counsel's investigation into TYC was reasonable. Both Ms. Drake and Dr. Skop testified that they had obtained and reviewed Petitioner's TYC records prior to evaluating Petitioner. 19 RR 7, 25, 36. Although Petitioner contends counsel should have investigated further to uncover evidence of TYC's dysfunction in order to refute testimony concerning the rehabilitative opportunities offered by TYC, Petitioner fails to cite

anything in the record that would have alerted counsel or their experts that such evidence existed. Indeed, if TYC was a "place of chaos, disorder, and violence," as he now asserts, Petitioner himself would have been the best source of this information. Under *Strickland*, the reasonableness of counsel's actions is substantially influenced by information supplied by the defendant, and the reasonableness of investigative decisions depends on this information. 466 U.S. at 691. Because Petitioner failed to disclose such information, trial counsel's investigation was not deficient. *See Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) (holding that whether or not counsel's investigation is reasonable may critically depend on the information provided by the defendant).

Finally, this Court rejects Petitioner's implication that trial counsel was obligated to hire additional experts to find evidence of organic brain damage, PTSD, and depressive disorder. *Strickland* does not require counsel to "canvass[] the field to find a more favorable defense expert." *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000). To the contrary, counsel was entitled to rely on the opinions of their own mental health experts in deciding what defensive theories to pursue. *See, e.g., Turner v. Epps*, 412 F. App'x 696, 702 (5th Cir. 2011) (unpublished) ("Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment . . .") (quoting *Smith v. Cockrell*, 311 F.3d 661, 676-77 (5th Cir. 2002), *overruled in part on other grounds*, *Tennard v. Dretke*, 542 U.S. 274 (2004)). Because there was no "objective indication" that Petitioner suffered from brain damage, counsel will not be labeled deficient for failing to pursue this avenue of mitigation. *See Earp v. Cullen*, 623 F.3d 1065, 1076-77 (9th Cir. 2010) (finding that an expert's "failure to diagnose a mental condition does not

constitute ineffective assistance of *counsel*, and [Petitioner] has no constitutional guarantee of effective assistance of experts") (emphasis in original).

Regardless, even assuming counsel was deficient in failing to investigate and present certain evidence, Petitioner fails to demonstrate that the results of the proceeding would have been different had counsel discovered such evidence. *Strickland*, 466 U.S. at 694 (finding that, in order to demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). When the missing evidence is weighed against the aggravating evidence presented at trial, it is clear Petitioner was not prejudiced from any alleged deficiencies in counsel's investigation. *Id.* at 698 (finding no prejudice due to State's overwhelming evidence on aggravating factors supporting the death penalty); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (finding no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State").

As detailed in Section I(B), Petitioner took the stand and testified before the jury that he did not blame the circumstances of his childhood or the way he was raised for his behavior. 18 RR 59-117. Petitioner agreed that TYC offered him numerous opportunities to turn his life around but that he failed to take advantage of them. He also asked the jury to give him the death penalty because he knew he is a future danger and that no mitigating evidence warranted a life sentence. Petitioner then described in detail how he murdered Andrade in cold blood and admitted to at least 25-30 other burglaries or aggravated robberies that he committed because he was addicted to the adrenaline rush. Prior to this testimony, the jury heard extensive evidence concerning Petitioner's criminal history and propensity for violence, as well as evidence

regarding Petitioner's inability to reform his conduct while incarcerated as both a juvenile and adult. Thus, given Petitioner's testimony and the overwhelming evidence establishing his future dangerousness and lack of mitigating circumstances, Petitioner fails to establish the result would have been different had counsel discovered the evidence in question. As Petitioner fails to establish either prong of the *Strickland* inquiry, relief is denied.

      3.      <u>Competency</u> (Claim 5)

In his fifth claim, Petitioner argues his trial counsel were ineffective for failing to investigate evidence of his incompetency or request an inquiry into his mental state. According to Petitioner, counsel were obligated to inquire into his competency for the same reasons the trial court was—Petitioner's mental health issues, depression, suicidal ideation, history of substance abuse, and his decision not to follow counsel's advice. Petitioner's allegation, which was not raised in the state court and is thus unexhausted and procedurally defaulted, also does not meet either prong of the *Strickland* analysis on *de novo* review.

The record in this case indicates that counsel had several conversations with their client and that they never doubted his competency to waive his rights and plead guilty. 13 RR 11; 18 RR 54; 20 RR 7. In fact, counsel informed the trial court of their belief that Petitioner had a rational understanding of the proceedings against him and had no problem communicating with them about the case. *Id*. As such, Petitioner fails to establish that his trial counsel's performance was deficient for the same reasons that the trial court did not violate *Pate* by failing to hold a competency hearing—Petitioner's behavior was hardly irrational, but rather reflected a sincere desire to repent, give justice to the families of those he has harmed, and strengthen his faith and relationship with God. Based on their conversations with Petitioner, there was nothing before trial counsel to lead them to question Petitioner's competency, nor was any concern raised from

Dr. Skop, the defense team's expert. It is thus clear counsel considered the issue and made the reasonable decision not to pursue the issue. A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003).

Moreover, this claim of ineffectiveness is undermined by the discussion from Section IV(C). That is, Petitioner's trial counsel could not have been deficient in failing to discover his alleged incompetence where there was nothing before either the trial court or counsel indicating that Petitioner was actually incompetent. "There can be no deficiency in failing to request a competency hearing where there is no evidence of incompetency." *Carter v. Johnson*, 131 F.3d 452, 464 (5th Cir. 1997) (quoting *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989)). Petitioner thus fails to demonstrate the first prong of the *Strickland* test.

Regardless, Petitioner cannot establish he was prejudiced by counsel's failure to investigate because Petitioner was found competent by the trial court. 20 RR 19 ("It plainly appearing to the Court that [Petitioner] is mentally competent, and that he makes this plea freely and voluntarily, his plea is by the Court received."). This finding of fact is presumed correct under § 2254(e)(1) and Petitioner has failed to overcome that presumption by clear and convincing evidence. It necessarily follows that Petitioner was not prejudiced by trial counsel's failure to contest his competency, as he cannot establish the results of his proceeding would have been different had counsel inquired into his competency. *See Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014) (finding no prejudice where there is no evidence of incompetency). Petitioner cannot make the showing of prejudice necessary under *Strickland*'s second prong and is therefore denied relief on his IATC allegation.

4. <u>Testimony of Raymond Valero</u> (Claim 10)

Petitioner next alleges trial counsel was ineffective for failing to properly impeach prosecution witness Raymond Valero regarding his alleged membership in the Mexican Mafia street gang. Valero met Petitioner while they were incarcerated at the Bexar County Jail and testified that Petitioner confessed many crimes and criminal plans to him during their incarceration together, including the underlying murder. Petitioner also confessed to Valero his original plan to "shoot his way out" if police had arrested him and his plan to escape during trial by using the judge as a "human shield." Petitioner argues Valero embellished his testimony and asserts trial counsel was ineffective on cross-examination by only insinuating that Valero was lying about his gang membership instead of impeaching him on the issue.

Petitioner's allegation does not meet either prong of the *Strickland* analysis. A petitioner alleging that an investigation is deficient must show what the investigation would have uncovered and how the petitioner's defense would have benefited from this information. *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1993); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986). Petitioner argues counsel should have uncovered evidence of Valero's gang membership. He does not, however, establish that any part of Valero's testimony was embellished or made up, much less explain how affirmative evidence of Valero's gang membership would have assisted counsel in impeaching such testimony. The record shows that counsel thoroughly cross-examined Valero on his alleged gang membership, heroin addiction, and numerous felony convictions, as well as the fact that Valero received a reduced sentence in exchange for his testimony. It is unclear how evidence of Valero's gang membership would have impeached Valero's credibility any more than counsel's cross-examination.

Regardless, even assuming counsel was deficient in failing to discover evidence of Valero's gang membership, Petitioner fails to demonstrate that the results of the proceeding would have been different had counsel discovered such evidence. *Strickland*, 466 U.S. at 694. Petitioner claims he can demonstrate prejudice because the State's case for future dangerousness was predicated "in large part on the lies told by Valero." ECF No. 40 at 53. This is simply not true. As demonstrated in this Court's previous summary of the trial testimony (Section I(B)), the State's case for future dangerousness was predicated almost entirely on Petitioner's numerous violent felonies and inability to reform his conduct while incarcerated. Valero's testimony was a small part of the State's overwhelming evidence of Petitioner's future dangerousness which established Petitioner's extensive criminal history and an escalating pattern of violence. In addition, the jury heard testimony concerning the heinous nature of the capital murder for which Petitioner plead guilty, including from Petitioner himself, who agreed he was indeed a future danger to society. Thus, there is no merit to Petitioner's bald assertion that the results of the punishment phase would have been different had counsel impeached Valero's testimony more thoroughly with evidence of an alleged gang membership.

5.      Dr. Sherman's Report (Claim 11)

In Petitioner's final IATC allegation, he asserts trial counsel were ineffective for failing to object to the admission and recitation of Dr. J. O. Sherman's 1994 psychological report of Petitioner. Dr. Sherman's report, admitted and read to the jury during the testimony of Petitioner's juvenile probation officer, Jose Martinez, included Dr. Sherman's impressions of Petitioner's mental and emotional health at the time. Petitioner contends this evidence is testimonial and should have been barred from trial under the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Petitioner raised this allegation on state habeas, and an evidentiary hearing was held on this (and other) issues. During the hearing trial counsel testified that he did not object to Petitioner's voluminous juvenile records being admitted, which included Dr. Sherman's report, because there was favorable evidence in them that showed Petitioner "truly tried to do the right thing." The state habeas court later rejected Petitioner's claim, finding trial counsel's decision not to object to the records and Dr. Sherman's report was a reasonable trial strategy. I SHCR at 253-54. Petitioner fails to overcome the presumption that counsel's decision was the product of "reasonable professional judgment." *Titlow*, 571 U.S. at 17.

Petitioner does not establish that counsel's decision to allow the records was "so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton*, 343 F.3d at 752-53. As the state court found, counsel's choice comported with their strategy to be completely open and honest about Petitioner's past transgressions. I SHCR at 253-54. On federal habeas review, this Court is mindful that "*Strickland* does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529, 534 (5th Cir. 2006). In other words, simply because counsel's strategy was not successful does not mean counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009). Because there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," Petitioner's allegation fails. *Richter*, 562 U.S at 105.

Even if Petitioner could establish that counsel's failure to object constituted deficient performance, he still fails to demonstrate that the results of the proceeding would have been different had an objection been successful. *Strickland*, 466 U.S. at 694. Contrary to Petitioner's assertion, Dr. Sherman's report was only a small part of the State's overwhelming evidence of Petitioner's future dangerousness. There is virtually no chance the results of Petitioner's

punishment phase would have been different had the report been effectively excluded. Accordingly, relief is denied.

## F.     General Assembly and Voir Dire (Claims 7, 8)

In Petitioner's seventh claim for relief he argues the trial court excused, off the record, nearly a quarter of the voir dire panel while Petitioner was absent from the courtroom, in violation of his constitutional right to be present during "critical proceedings."  In his eighth claim, Petitioner challenges the exclusion of two prospective jurors for cause because they voiced general objections to the death penalty.  Petitioner raised the majority of these allegations[10] in the state court during his state habeas proceedings which were considered and ultimately rejected by the TCCA.  He fails to demonstrate that the state court's adjudication of these claims was either contrary to or involved an unreasonable application of clearly established federal law.

### 1.     Both claims are *Gardner*-barred

In rejecting both of the above allegations the state habeas court found both claims procedurally barred and alternatively meritless.  Citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004), the state court found Petitioner's claims to be procedurally defaulted because Petitioner could have raised the claims on direct appeal.  I SHCR at 207, 211.  The TCCA later adopted the state habeas court's findings and denied Petitioner's application.  *Ex parte Luna*, 2015 WL 1870305.  Based on this procedural history, both of Petitioner's claims are now procedurally barred.

---

[10]     As he does in Claim 7 of his amended federal petition, Petitioner argued during his state habeas proceedings that his absence from the courtroom during a "critical proceeding" violated his due process and confrontation rights.  *See* Supp. SHCR at 16-22.  Petitioner did not, however, argue that his absence violated his right to a complete defense under *United States v. Cronic*, 466 U.S. 648 (1984), or that the trial court's failure to make a record of the proceeding violated his Eighth and Fourteenth Amendment rights as he does now.  Again, claims are not exhausted "if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court."  *Wilder*, 274 F.3d at 259.  Thus, these allegations are unexhausted and procedurally defaulted for the reasons discussed in Section IV(A), *supra*.

Under the doctrine of procedural default, this Court is precluded from reviewing "claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 137 S. Ct. at 2064. The state habeas court's finding of procedural default constitutes such a denial. The state court determined Petitioner's allegations to be procedurally defaulted under *Nelson*, 137 S.W.3d at 667, a case which in turn relies on *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998). This rule from *Gardner*—which bars consideration of claims that could have been but were not raised on direct appeal—is "an adequate state ground capable of barring federal habeas review." *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005) (citing *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004)).

2.    <u>Petitioner's absence during general assembly</u> (Claim 7)

The Supreme Court has held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the proceeding." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The Court has also recognized that voir dire "is a critical stage of the criminal proceedings, during which the defendant has a constitutional right to be present." *Gomez v. United States*, 490 U.S. 858, 873 (1989). In this case, Petitioner contends his right to be present at a critical voir dire proceeding was violated when the trial court excused 33 of 140 members[11] of the venire panel for unknown reasons in a proceeding that was off the record and outside the presence of the defense. Petitioner's claim fails, however, because the trial court's ruling did not occur at a critical proceeding or during voir dire, but rather during the general assembly where prospective jurors are initially summoned.

---

[11]    As the sole support for this allegation, Petitioner refers to defense counsel's notes regarding the jury panel which were apparently attached to his state habeas petition as Exhibit D. As it is the policy of the TCCA not to copy jury information into the record, however, this Court is without a copy of the referenced jury list. In the interests of justice and expediency, the Court will assume the list is as Petitioner states.

In *Jasper v. State*, the TCCA explained what happens when prospective jurors are first summoned:

> Generally, when prospective jurors are initially summoned, they are assembled in a general jury pool or general assembly. [citation omitted]. Members of the general assembly are qualified on their ability to serve and exemptions and excuses are heard and ruled on by the judge presiding over the general assembly. Prospective jurors who are not disqualified, exempt, or excused are divided into trial panels and sent to the individual courts trying the cases. At that point, attorney voir dire will result in the jury that will ultimately hear the case.

61 S.W.3d 413, 422-23 (Tex. Crim. App. 2001).

Contrary to Petitioner's assertion, the general assembly portion of jury selection is not part of Petitioner's trial under Texas law; therefore, he was not entitled to be present. *Id.* at 423 (citing *Chambers v. State*, 903 S.W.2d 21, 31 (Tex. Crim. App. 1995)). This is so because "prospective jurors who are summoned to a general assembly have not been assigned to any particular case [and][t]he judge presiding over the general assembly is assigned for that purpose only at that time and has no given case in mind." *Chambers*, 903 S.W.2d at 31. Although Petitioner asserts he was entitled to be present because "the entire general assembly was assigned to [his] case," ECF No. 40 at 44, nothing from the record supports this assertion. In fact, the record indicates the opposite. *See* 2 RR 4-15 (first day of voir dire where trial judge introduces the parties and relevant legal principles involved to the jury for the first time).

As noted by Respondent, Petitioner cites no Supreme Court precedent holding that a defendant has a constitutional right to be present during the general assembly. Nor has Petitioner shown that the complained-of proceeding was a part of voir dire during which he has a constitutional right to be present. *United States v. Thomas*, 724 F.3d 632, 642 (5th Cir. 2013) (finding the right to be present at a jury empanelment is protected by the Due Process Clause); *Chambers*, 903 S.W.2d at 31 (explaining that "voir dire examination" in Texas refers to the

examination of prospective jurors *after* they have been assigned to a particular court and case from the general assembly"). Consequently, Petitioner fails to demonstrate that the state court's rejection of this claim was unreasonable.

Furthermore, Petitioner has not shown that his presence during the summary dismissal of the potential jurors would have been helpful. The core concern of the right to courtroom presence is that a defendant's "absence might frustrate the fairness of the proceedings . . . ." *Faretta v. California*, 422 U.S. 806, 820 n.15 (1975). But due process does not require the defendant's presence when it would be "useless or only slightly beneficial." *Snyder v. Massachusetts*, 291 U.S. 97, 106-07 (1934). Petitioner has not established that he "could have done [anything] had [he] been at the [hearing] nor would [he] have gained anything by attending." *Stincer*, 482 U.S. at 747 (alterations in original). Petitioner's absence therefore did not violate his due process rights because his "presence would be useless, or the benefit but a shadow. . ." *Id.* at 745 (citing *Snyder*, 291 U.S. at 106-07).

Finally, in order to grant federal habeas relief, the trial error must have a substantial and injurious effect or influence in determining the jury's verdict. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). As a general rule, a trial court's erroneous venire rulings do not constitute reversible constitutional error "so long as the jury that sits is impartial." *Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004) (citing *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000)). Petitioner makes no argument that an unqualified or biased juror sat on his jury. As result, even if Petitioner could demonstrate that the trial court erred in dismissing prospective jurors outside of his presence at general assembly, relief would still be denied because the error was harmless. *Brecht*, 507 U.S. at 637-38.

3.     <u>Removal of Prospective Jurors</u> (Claim 8)

Claim 8 pertains to the removal of prospective jurors Harold Franklin and Barbara Ann Torres during voir dire. According to Petitioner, the prospective jurors were excluded from the jury simply because they voiced general objections to the death penalty in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and *Wainwright v. Witt*, 469 U.S. 412 (1985). Under the *Witherspoon-Witt* rule, "a veniremember may not be excluded from sitting on a capital jury simply because she voices general objection to the death penalty or expresses conscientious or religious scruples against its infliction." *Ortiz v. Quarterman*, 504 F.3d 492, 500 (5th Cir. 2007) (citation omitted). Rather, a potential juror may be removed for cause if the individual's views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (citing *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A venire member must be willing not only to accept that the death penalty is, in certain circumstances, an acceptable punishment, but also to answer the statutory questions "without conscious distortion or bias." *Mann v. Scott*, 41 F.3d 968, 981 (5th Cir. 1994) (citing *Adams*, 448 U.S. at 50).

Excusing a juror for cause in violation of the *Witherspoon-Witt* standard is reversible error and not subject to harmless error review. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987). This standard does not require that a juror's bias be proved with "unmistakable clarity," particularly because such determinations "cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Witt*, 469 U.S. at 426. Whether a juror is excludable for bias under the *Witherspoon-Witt* standard is a question of fact subject to deferential review under AEDPA. 28 U.S.C. § 2254(e)(1); *Ortiz*, 504 F.3d at 501. For this reason, a reviewing court, "especially federal courts considering habeas petitions, owe deference

to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." *Uttecht v. Brown*, 551 U.S. 1, 22 (2007); *Witt*, 469 U.S. at 424-26.

<u>Harold Franklin</u>

Petitioner first contends that prospective juror Franklin was removed "because he initially might have expressed a general abstract objection against the death penalty." ECF No. 22 at 100. Despite Franklin repeatedly expressing doubts about whether he could honestly answer the special issues knowing it could result in a death sentence, Petitioner argues Franklin "could not have been clearer" in expressing that he could follow the law after carefully considering the particular facts of the case. *Id*. The record does not evince any clarity on Franklin's part concerning his ability to follow the law. *See* 3 RR 4-23. To the contrary, it reflects that Franklin's reservations toward the death penalty would substantially impair his ability to make an impartial decision.

In response to the only question before him—whether he would be able to honestly answer the special issues knowing that it could result in a death sentence—Franklin vacillated and repeatedly doubted his ability to impose the death penalty because of his personal moral beliefs. *Id*. at 12 (". . . but not knowing the circumstances, it would be very difficult for me to actually say that I could do that") ("I really don't think I could"), 13-14 (stating he could not participate in the process because it would do violence to his personal moral beliefs). After being partially rehabilitated by trial counsel and asserting he would be "as fair as I could be," Franklin again doubted his ability to impose a death sentence:

> A:      Like I said, it's—it's a lot of variables involved. I don't think that right now I could, to answer your question. I could not right now at this point in time. No.

* * *

| Q: | And you were there, and you have found somebody guilty of capital murder beyond a reasonable doubt. And then you have heard whatever other evidence might be presented. And you knew that the answers to the questions were such that the result would be death, would you be able to do it? |
| A: | I'm sorry I'm so ambivalent, but I don't think I could. |

THE COURT:      What was your answer? I don't think I could?

| A: | I don't think I could. |

*Id*. at 21-22.

Even if, as Petitioner asserts, Franklin indicated that he would follow the law, such an expressed willingness to follow the law does not necessarily overcome other indications of bias. *See Morgan v. Illinois*, 504 U.S. 719, 735 (1992) (explaining that a prospective juror may believe she can follow the law and yet will actually be so biased in one direction or another that her inclusion would infect a trial with fundamental unfairness). Here, Franklin's reluctant assurance that he might be able to consider imposing the death penalty depending on the circumstances did not overcome the reasonable contrary inference that he was in fact substantially impaired in his ability to answer the statutory questions "without conscious distortion or bias." *Mann*, 41 F.3d at 981. Moreover, the trial court was in the best position to observe Franklin's demeanor and tone of voice in order to make a credibility determination, and Petitioner fails to demonstrate why that determination should not be entitled to the presumption of correctness it is afforded. *Uttecht*, 551 U.S. at 9 (finding that deference to the trial court is appropriate because the trial court is in the best position to evaluate the demeanor of the jury venire, which is "of critical importance in assessing the attitude and qualifications of potential jurors").

Petitioner has not presented clear and convincing evidence to rebut the trial court's finding that this prospective juror could not fulfill his obligations as a juror in a capital case. *See Ortiz*, 504 F.3d at 501 (finding a state court's resolution of a *Witherspoon-Witt* claim is entitled

to a presumption of correctness rebuttable only by clear and convincing evidence). As a result, he fails to show that the state court's rejection of this claim was contrary to, or involved an unreasonable application of, the *Witherspoon-Witt* standard.

Barbara Ann Torres

Petitioner next contends that prospective juror Torres was removed because of her general objections to the death penalty based on her religious beliefs. On her jury questionnaire, Torres stated that she held religious beliefs that would prevent her from sitting in judgment of another human being. 3 RR 102. Torres reaffirmed this position during voir dire, stating that, as a Catholic, she still felt like she could not judge or decide whether someone lived or died. *Id.* at 102-05. During the state habeas proceedings, the TCCA adopted the trial court's findings that Torres was struck as a result of her religious belief that she could not sit in judgment of another person. *Ex parte Luna*, 2015 WL 1870305 at *1; I SHCR at 211-14.

This Court can grant federal habeas relief only if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Fuller v. Johnson*, 114 F.3d 491, 500-01 (5th Cir. 1997) (holding that a trial court's finding of juror bias is entitled to a presumption of correctness). Again, factual determinations are presumed correct, and Petitioner has the burden of rebutting these determinations by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). He has not done so in this case. Although Petitioner contends Torres eventually indicated "an intent and willingness to apply Texas's special issues when given the opportunity," ECF No. 22 at 104, nothing in the record supports this assertion. Throughout the questioning, Torres repeatedly expressed her belief that she could not judge whether someone lived or died. 3 RR 102, 104-05. Her examination ended with the following exchange:

Q:      So I'm going to ask you again.  Could you be a part of this process that could result in his execution?

A:      No.

* * *

Q:      . . . Okay.  Is that based on your own personal, moral, and religious beliefs?

A:      Yes.

Q:      Just like you wrote in your questionnaire?

A:      Yes.

Q:      And that's your final answer?

A:      Yes.

*Id*. at 105.

The record clearly indicates that, regardless of the evidence, Torres's personal beliefs would prevent her from ever answering the special issues in a way that would result in a death sentence for Petitioner.[12]    Thus, Torres was properly excluded in accordance with the *Witherspoon-Witt* standard.  Petitioner has not met AEDPA's high standard with regard to the trial court's factual determination that Torres was biased, nor has he shown that it was unreasonable for the TCCA to uphold her dismissal for cause.  *See United States v. Jackson*, 549 F.3d 963, 973 (5th Cir. 2008) (affirming dismissal of potential juror who indicated on her questionnaire that she did not feel she had the right to judge whether a person lives or dies but then wavered during questioning); *United States v. Bernard*, 299 F.3d 467, 474-75 (5th Cir. 2002) (same).  Federal habeas relief is therefore denied.

---

[12]      Similarly, the record does not support Petitioner's argument that Torres was only asked insufficient "general inquiries" and "follow the law" questions in violation of *Morgan v. Illinois*, 504 U.S. at 734-35.  Unlike *Morgan*, both parties were allowed to question Torres extensively about her views on the death penalty to determine whether she would ever be able to impose a death sentence.   Thus, this is not a case where Petitioner was denied inquiry "into whether the views of prospective jurors on the death penalty would disqualify them from sitting."  *Id*. at 731.

**G.**    **Petitioner's Shackling During Trial** (Claim 9)

In his ninth claim for relief, Petitioner asserts his rights under the Fifth and Fourteenth Amendments were violated because his shackles were brought to the jury's attention. According to Petitioner, his due process rights were violated twice in this case—once *prior* to his testimony when a bailiff informed the jury that Petitioner was restrained with leg locks under his clothes, and once *during* his testimony when the trial court subjected him to additional shackling around his ankles and left hand. Petitioner did not present this claim to the state courts either on direct appeal or during his state habeas proceedings. As a result, the claim is procedurally barred from federal habeas relief. *See* Section IV(A), *supra*. Even if the claim was reviewed under a *de novo* standard, however, relief would be denied.

"Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process," can interfere with a defendant's ability to communicate with counsel, and "affronts the dignity and decorum of judicial proceedings." *Deck v. Missouri*, 544 U.S. 622, 630-31 (2005). For these reasons, the Constitution forbids the use of "physical restraints visible to the jury" absent a determination by the trial court that the restraints "are justified by a state interest specific to a particular trial." *Id*. at 629. A trial court is justified in ordering physical restraint where there is "a danger of escape or injury to the jury, counsel, or other trial participants." *Bagwell v. Dretke*, 372 F.3d 748, 754 (5th Cir. 2004); *United States v. Joseph*, 333 F.3d 587, 591 (5th Cir. 2003).

Petitioner first contends that he had been restrained with leg locks under his clothes during his trial, but that the jury was unaware of this until a bailiff told them so (apparently to alleviate concern) sometime after Raymond Valero testified. Petitioner bases this assertion solely on the unexhausted declaration of Antonio Perez, a juror who stated that the bailiff's

disclosure occurred sometime after Valero's testimony but before Petitioner testified.  There is no evidence in the record to corroborate Petitioner's assertion that he was restrained prior to his testimony.  But even if he was, this restraint would avoid the Due Process concerns of *Deck* because, as Perez's declaration affirms, the restraints were not "visible to the jury."

Assuming Perez's declaration to be credible, it is more likely that the bailiff in question was referring to the restraints placed on Petitioner after Valero testified to Petitioner's plans to escape and *after* Petitioner disclosed his desire to testify on his own behalf.  Just prior to Petitioner taking the stand, outside the presence of the jury, the trial court explained his decision to have Petitioner shackled as a result of his decision to testify:

> Let me just—let the record reflect, I think the record is abundantly clear of the additional security precautions we've had to take because of this.

> In light of the evidence that has been found in your jail cell and on your person, and other evidence that has been developed, and in light of the fact that you've entered a guilty plea, it has been my decision, along with those of my bailiffs, to shackle you at the ankles, and handcuff your left hand to the belt.

> * * *

> That way when [the jury] come[s] in they will not be aware of any of the restraints that have been placed on you.  Although the law is abundantly clear that I'm entitled to do that, and the jury would be entitled to know that, we're not going to bring that to their attention.

18 RR 55-56.  The record thus supports the fact that Petitioner was only restrained after his decision to testify—otherwise, the trial court's decision to take "*additional* security precautions" by shackling Petitioner would be redundant.

Moreover, the trial court's decision to shackle Petitioner was fully justified.  *See Joseph*, 333 F.3d at 591 (finding physical restraint may be justified where there is "a danger of escape or injury to the jury, counsel, or other trial participants").  As Valero's testimony demonstrated, Petitioner clearly posed a danger of escape.  That Petitioner had not previously misbehaved in

court does not eliminate the import of Petitioner's violent past or plans to use a handcuff key or use the judge as a "human shield" to escape. A trial court need not wait until an obviously dangerous defendant actually injures trial participants or tries to escape from the courtroom before restraining him. *See United States v. Fields*, 483 F.3d 313, 357 (5th Cir. 2007) (finding district court did not err in deciding that defendant should wear a stun belt under his clothes due to his violent history and past escape attempts).

Even if Petitioner were erroneously shackled, the error was harmless. On habeas review, a federal court can grant relief only when the use of restraints "had a substantial and injurious effect or influence in determining the jury's verdict." *Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009) (citing *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007)). In this case, the trial court appropriately took steps to minimize any risk of prejudice by advising Petitioner that, if he felt uncomfortable, the judge would stop the proceedings and excuse the jury. 18 RR 56. The bailiffs also arranged to bring the jury in on a different side of Petitioner. *Id.* These steps helped to ensure that the jury would neither see the restraints nor surmise that Petitioner was being treated any differently.

Regardless, the overwhelming evidence presented by the State was sufficient to render harmless any error in the trial court's shackling of Petitioner. *Hatten*, 570 F.3d at 604. As discussed previously, Petitioner took the stand and asked the jury to give him the death penalty because he is a future danger and no mitigating evidence warranted a life sentence. *See* Section I(B), *supra*. Petitioner also admitted on cross-examination to having the handcuff key and stated he would have taken advantage of it to escape had the opportunity presented itself. 18 RR 72. The jury also heard overwhelming evidence concerning Petitioner's extensive criminal history and violence, in addition to hearing about Petitioner's inability to reform his conduct while

incarcerated as both a juvenile and adult.  Thus, given the overwhelming nature of the evidence presented by the State at punishment, Petitioner fails to establish that his restraints had a "substantial and injurious effect or influence" on the jury's ultimate decision.  *Fry*, 551 U.S. at 121-22.  Relief is denied.

## H.    <u>Unitary Proceeding</u> (Claim 12)

Following Petitioner's plea of guilty, the trial court and the parties agreed to hold a unitary proceeding where each party would submit evidence concerning Petitioner's punishment, after which the jury would be instructed to find Petitioner guilty and consider only the punishment phase special issues.  13 RR 3-15.  After evidence was presented by both parties, the trial court instructed the jury to find Petitioner guilty of capital murder.  20 RR 19.  The jurors deliberated on guilt/innocence and returned a verdict finding Petitioner guilty of capital murder as charged in the indictment.  *Id*. at 20.  The trial court then read the punishment charge to the jury before the parties made their closing arguments.  *Id*. at 21-27.  Following closing arguments, the jury deliberated on the punishment issues before sentencing Petitioner to death based on their answers to the special issues.  *Id*. at 53-54.

In his twelfth claim for relief, Petitioner contends the trial court conducted an unauthorized "ad hoc" proceeding by having the jury simultaneously consider evidence of his guilt/innocence and evidence concerning punishment presented in a single, unitary proceeding as opposed to having separate, bifurcated proceedings.  According to Petitioner, the Constitution requires juries to consider a capital defendant's guilt/innocence separately from the sentencing determination "so that evidence relevant to the determination of one will not influence the determination of the other."  This claim was raised and rejected during Petitioner's direct appeal proceedings.  *Luna*, 268 S.W.3d at 597-98.  Petitioner fails to demonstrate the state court's

rejection of the claim was contrary to, or an unreasonable application of, Supreme Court precedent.[13]

Petitioner's allegation fails for a simple reason—no Supreme Court precedent mandates that a defendant receive a bifurcated proceeding in a capital murder case following the entry of a guilty plea. Citing *Gregg v. Georgia*, Petitioner contends the jury in his case was left without the "adequate guidance" a bifurcated trial would have afforded them by focusing their attentions to the "constitutionally distinct duties of adjudicating guilt and then determining an appropriate individualized punishment." 428 U.S. 153, 189 (1976). But when a defendant pleads guilty in a capital case, there is no longer a danger of confusing these "distinct duties" because the need for a guilt/innocence phase is eliminated. *See Kercheval v. United States*, 274 U.S. 220, 223 (1927) (finding a guilty plea "is itself a conviction" which requires nothing more than a judgment and sentence). In other words, once a defendant enters a guilty plea in a capital case, the only evidence the jury will hear will be regarding the punishment phase of trial.

In declining to hold that bifurcated proceedings are constitutionally mandated, the TCCA explained:

> [T]he plea of guilty before a jury essentially becomes a trial on punishment since entry of a plea of guilty before a jury establishes a defendant's guilt except where evidence demonstrates his innocence. (Citations omitted). The introduction of evidence is not to determine guilt but is to enable the jury to intelligently exercise discretion in determining the appropriate punishment.

*Luna*, 268 S.W.3d at 598 (citations omitted). The court then found that once a defendant pleads guilty to a jury, "[t]he case simply proceeds with a unitary punishment hearing." *Id.* (citing *Fuller v. State*, 253 S.W.3d 220, 227 (Tex. Crim. App. 2008)). Petitioner fails to show that this

---

[13] Petitioner also alleges he was denied his right to a jury trial when the trial court directed the jury to return a verdict of guilty in violation of his Fifth, Sixth, and Fourteenth Amendment rights. ECF No. 22 at 137-41. Because Petitioner never raised this allegation in state court, however, it is unexhausted and procedurally barred from federal habeas review. *See* Section IV(A), *supra*. In any event, the claim is frivolous because the cases cited by Petitioner do not concern a directed verdict after a guilty plea, but rather stand only for the uncontroversial position that a trial court may not direct a jury considering evidence to find a defendant guilty.

determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Moreover, as pointed out by Respondent, the relief requested by Petitioner is barred by the anti-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Under *Teague*, federal courts are generally barred from applying "new" constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A new rule for *Teague* purposes is one which was not "dictated by precedent existing at the time the defendant's conviction became final." *Felder v. Johnson*, 180 F.3d 206, 210 (5th Cir. 1999) (citing *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997)). The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) rules that would place certain primary conduct beyond the government's power to proscribe, and (2) bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997).

In this case, Petitioner's conviction and sentence became final for *Teague* purposes on October 5, 2009, when the Supreme Court denied his petition for certiorari after his conviction was affirmed on direct review in state court. Petitioner has pointed to no precedent since that time mandating a bifurcated proceeding in a capital murder case following a guilty plea. Nor does the new rule proposed by Petitioner fall within either of the two noted exceptions to the *Teague* doctrine. Consequently, *Teague* bars relief on Petitioner's allegation and precludes this Court from recognizing the new legal theory underlying Petitioner's claim.

## I.  Unanimous Jury Verdict (Claim 13)

In his thirteenth ground for relief, Petitioner challenges the jury's failure to unanimously determine which aggravated felony rendered him guilty of capital murder. Petitioner was

charged with intentionally causing Michael Andrade's death while in the course of committing or attempting to commit burglary, robbery, or arson. 13 RR 5-6. Because it is unclear as to which of these theories of capital murder the jury actually found him guilty, Petitioner argues his rights to due process, a jury trial, and reliable sentencing under the Sixth, Eighth and Fourteenth Amendments were violated. This claim was raised during Petitioner's direct appeal proceedings and was rejected by the TCCA. *See Luna*, 268 S.W.3d at 601. This disposition on the merits therefore receives the deference required by the AEDPA. *Dowthitt v. Johnson*, 230 F.3d 733, 756-57 (5th Cir. 2000).

The TCCA's determination of this issue does not conflict with United States Supreme Court precedent on this point. *See Schad v. Arizona*, 501 U.S. 624, 644 (1991) (plurality op.). In *Schad*, as occurred in Petitioner's case, the prosecution indicted on a single count of capital murder and alleged several different factual theories by which the defendant could have committed that single offense. *Id*. A majority of the Supreme Court recognized the general rule that a single count may include allegations the defendant committed the offense by one or more specified means and held there is no constitutional requirement the jury reach unanimity on the preliminary factual issues which underlie the verdict. *Id*. at 631-32. In reaching this decision, the Court stated that it "never suggested that in returning a general verdict [in cases where alternative methods of committing a single offense were pled] the jurors should be required to agree upon a single means of commission, any more than indictments were required to specify one alone." *Id*.

Because there is no constitutional requirement that a jury must unanimously determine which theory of capital murder was committed, the jury's general guilty verdict in this case was not erroneous and Petitioner's allegation lacks merit. *See Reed v. Quarterman*, 504 F.3d 465,

480-82 (5th Cir. 2007) (denying similar claim that allowing the jury to convict a defendant of capital murder "under two alternative theories without requiring unanimity as to one" violated due process). As such, the TCCA's rejection of this claim was neither contrary to, nor an unreasonable application of, relevant Supreme Court precedent. *Id.*; *see also Maxwell v. Thaler*, 350 F. App'x 854, 859 (5th Cir. 2009) (unpublished) (observing that "neither *Schad* nor our subsequent precedent interpreting it has been overruled implicitly or explicitly. Accordingly, we are bound by *Schad* and *Reed*"). Furthermore, because the Supreme Court's opinion in *Schad* implicitly, if not explicitly, rejected the legal premise underlying Petitioner's claim, adoption of the new rule advocated by Petitioner herein is foreclosed by the non-retroactivity principle of *Teague v. Lane, supra*. Relief is therefore denied.

**J.      The Special Issues (Claim 14)**

Petitioner next raises several challenges to Texas's death penalty system, arguing that he was sentenced to death under a statutory scheme that violated his Sixth, Eighth, and Fourteenth Amendment rights. As discussed below, each of these allegations is either procedurally barred, time barred, or foreclosed by Supreme Court and Fifth Circuit precedent.

1.      Special Issue Number One (Claim 14(A))

Under Texas's capital sentencing statute, the jury must answer two "special issues" before a sentence of death may be assessed. *See* TEX. CODE. CRIM. PROC. art. 37.071 § 2(b). Under the first special issue, the jury must decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id*. Petitioner contends this first special issue—the future-dangerousness special issue—is unconstitutionally vague because it does not define the terms "probability," "criminal acts of violence," and "continuing threat to society." As a result, Petitioner argues, neither the

statute nor the jury charge adequately channel the jury's discretion or narrow the class of defendants sentenced to death.

Petitioner raised this allegation both on direct appeal and during his state habeas proceedings which the TCCA denied based on previous TCCA precedent rejecting this allegation. *Luna*, 268 S.W.3d at 609; I SHCR at 257-258. Indeed, this claim is "far from novel." *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998). The Fifth Circuit has consistently upheld the future-dangerousness special issue against challenges to the phrases "probability," "criminal acts of violence," and "continuing threat to society." *See Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005); *Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999). The terms "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself." *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009). Accordingly, relief is denied because the state court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). Relief on this claim is also foreclosed by the non-retroactivity principle of *Teague v. Lane, supra. See Rowell v. Dretke*, 398 F.3d 370, 379 (5th Cir. 2005) (finding a violation of *Teague* would occur if the court were to accept petitioner's argument that the future-dangerousness special issue is unconstitutionally vague for failing to define the term "probability").

     2.    <u>Special Issue Number Two</u> (Claim 14(B))

Under Texas's second special issue—the mitigation special issue—Petitioner's jury was required to determine "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral

culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment . . . rather than a death sentence be imposed." TEX. CODE. CRIM. PROC. art. 37.071 § 2(e). Petitioner challenges the constitutionality of this special issue for two reasons: (1) the accompanying rule that instructs the jury that ten or more jurors must agree to assess a life sentence is confusing and creates an unnecessary risk of jury coercion, and (2) the statute fails to require the jury to make its findings beyond a reasonable doubt.

      a.    The 12–10 Rule

Concerning the mitigation special issue, Texas law requires the jury to be instructed that: (1) the jury shall return an answer of "yes" or "no"; and (2) the jury may not answer the issue "no" unless it unanimously agrees and may not answer the issue "yes" unless ten or more jurors agree. TEX. CODE. CRIM. PROC. art. 37.071 § 2(f). Citing *Mills v. Maryland*, 486 U.S. 367 (1988), Petitioner contends that this "12–10 rule" confuses jurors as to the effect of a single negative vote on the special issues, particularly when § 2(g) of the statute prohibits the jury from being instructed that a life sentence is automatically imposed if the jury is unable to respond unanimously to the special issues. According to Petitioner, the rule creates a danger that confused jurors may think their lone dissenting vote would have no effect on the ultimate sentence imposed which would diminish "each juror's individual sense of responsibility in the sentencing process." ECF 22 at 156.

The TCCA rejected this allegation during Petitioner's direct appeal proceedings. *Luna*, 268 S.W.3d at 609. This decision was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). In fact, this issue has been foreclosed for some time by the Supreme Court's decision in *Jones v. United States*, 527 U.S. 373, 381-82 (1999). In *Jones*, the Court explicitly

rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively mislead[s] [the jury] regarding its role in the sentencing process." *Id*. The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach a unanimous verdict had no bearing on the jury's role in the sentencing process. *Id*. Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation." *Id*.

The Fifth Circuit has also rejected this claim. "*Mills* is not applicable to the capital sentencing scheme in Texas. We have concluded that '[u]nder the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance.'" *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000) (quoting *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)). On that basis, the Fifth Circuit has repeatedly denied claims based on the 12–10 rule. *See Allen v. Stephens*, 805 F.3d 617, 632 (5th Cir. 2015); *Reed*, 739 F.3d at 779; *Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011). The Fifth Circuit also has held that any extension of *Mills* to Texas's penalty-phase instructions would violate *Teague*'s prohibition on habeas courts creating new constitutional law. *Blue v. Thaler*, 665 F.3d 647, 670 (5th Cir. 2011); *Druery*, 647 F.3d at 542-43. Petitioner is not, therefore, entitled to federal habeas relief.

b. The Burden of Proof

Petitioner next challenges the mitigation special issue because it does not require the jury to make its finding beyond a reasonable doubt. Citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Hurst v. Florida*, 136 S. Ct. 616 (2016), Petitioner contends that a finding on the mitigation special issue is a finding of fact that could potentially increase a defendant's sentence

"from a penalty of life to a penalty of death."  For this reason, Petitioner asserts the current statutory scheme is unconstitutional for not imposing a burden of proof on the State to prove to the jury beyond a reasonable doubt that a negative answer to the mitigation special issue is warranted.  Because Petitioner failed to exhaust this claim during either his direct appeal or state habeas proceedings, he is procedurally barred from federal habeas relief.  *See* Section IV(A), *supra*.  This allegation also fails for two additional reasons.

The allegation is barred under the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1)(A).  As noted by Respondent, Petitioner filed his initial federal habeas petition (ECF No. 13) on April 21, 2016, with only one day remaining on the § 2244(d)  limitations period.  However, Petitioner did not raise the instant allegation in this initial petition.  Instead, the issue was first raised on October 21, 2016, when Petitioner filed his amended federal habeas petition (ECF No. 22) with the Court.  Petitioner disputes this assertion, arguing the claim should "relate back" to the original timely petition under Federal Rule of Civil Procedure 15(c)[14] because it is not a new claim, but rather an argument in support of Claim 15 from his initial petition.  But Claim 15 from the initial petition challenged the jury's failure to determine which aggravated felony rendered Petitioner guilty of capital murder—a claim virtually identical to Claim 13 from Petitioner's amended petition—instead of challenging the lack of a burden of proof on the mitigation special issue.  Thus, Petitioner's new claim does not relate back to this initial petition and is therefore barred by the statute of limitations.[15]  *See Mayle v. Felix*, 545 U.S.

---

[14]  Rule 15(c)(2) instructs that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim . . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

[15]  Although the limitations period may be equitably tolled in certain "rare and exceptional" circumstances, *United States v. Riggs*, 314 F.3d 796, 799 (5th Cir. 2002), Petitioner does not make such an argument.  Even if he had, these circumstances do not exist in this case.  *See McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013) (finding that a federal habeas corpus petitioner may avail himself of the doctrine of equitable tolling "only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented

644, 650 (2005) (finding a claim does not relate back when it asserts a new ground for relief supported by facts that differ in both "time and type" from those in the original pleading).

Regardless of the time bar, "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell*, 398 F.3d at 378. As with his other challenges to the Texas special issues, Petitioner's contention that the Constitution requires that the State be assigned the burden of proof on the mitigation special issue has been repeatedly rejected by the Fifth Circuit. *Druery*, 647 F.3d at 546-47; *Blue*, 665 F.3d at 668-69; *Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir. 2009); *Paredes*, 574 F.3d at 292; *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007). Consequently, federal habeas relief is unwarranted.

3.     Evolving Standards of Decency (Claim 14(C))

Petitioner's final allegation regarding the Texas capital sentencing scheme asserts that the death penalty in general is arbitrary, inconsistent with evolving standards of decency, and serves no valid penological purpose. As support for his argument, Petitioner contends: (1) there is a "national trend" toward abolishing the death penalty; (2) the death penalty is excessive and ineffective at promoting any penological purpose; (3) there is an international consensus against the death penalty; and (4) capital punishment in this country has not been applied equally and consistently. This allegation fails for several reasons.

As with numerous other allegations raised in his amended petition, Petitioner did not raise this allegation either on direct appeal or during his state habeas corpus proceedings. The claim is therefore unexhausted and procedurally defaulted for reasons already discussed. *See* Section IV(A), *supra*. Petitioner's claim is also time-barred for the reasons discussed in the previous section because the claim was not raised in Petitioner's initial federal petition (ECF No.

timely filing"); *Holland v. Florida*, 560 U.S. 631, 649 (2010).

13) and does not "relate back" to any timely claim alleged in that petition. Even if the Court were to review the merits of Petitioner's allegation, Supreme Court precedent clearly forecloses any argument that capital punishment violates the Constitution in all circumstances as Petitioner now contends. *See Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015) (recognizing that "it is settled that capital punishment is constitutional"); *Baze v. Rees*, 553 U.S. 35, 41-44 (2008) (examining the various forms of capital punishment upheld since the nineteenth century); *McCleskey v. Kemp*, 481 U.S. 279, 305-06 (1987); *Gregg v. Georgia*, 428 U.S. 153, 169 (1976) (reaffirming that the death penalty "does not invariably violate the Constitution"). As the Supreme Court noted in *Baze*: "[r]easonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable . . . [But][t]his Court has ruled that capital punishment is not prohibited under our Constitution[.]" 553 U.S. at 62.

Because the Supreme Court has repeatedly upheld capital punishment as constitutional, the views of the international community, as well as any alleged "national trend" away from its use, are largely irrelevant. Even if they weren't, federal habeas relief would be barred by the non-retroactivity doctrine of *Teague v. Lane* because it would require the creation of a new constitutional rule of law. As such, relief is denied.

## K.    **Cumulative Error** **(Claim 15)**

In his final allegation, Petitioner argues that even if none of the above allegations independently entitle him to relief, their cumulative prejudicial effect denied him his right to due process and to the effective assistance of counsel. Petitioner is not entitled to relief on this claim because many of the claims Petitioner wishes to cumulate are procedurally barred from federal habeas corpus relief. *See Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (*en banc*)

(establishing, as a condition for showing cumulative error, that "the error complained of must not have been procedurally barred from habeas corpus review"). Moreover, the cumulative-error claim itself is unexhausted and procedurally barred and Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice in order to overcome the procedural bar. *See* Section IV(A), *supra*.

Aside from procedural defects, Petitioner has not demonstrated that any constitutional error occurred. The Fifth Circuit has made it clear that cumulative error analysis is only appropriate where there is constitutional error to cumulate. *United States v. Delgado*, 672 F.3d 320, 344 (5th Cir. 2012) (*en banc*); *Derden*, 938 F.2d at 609. Allegations that alone are insufficient to demonstrate constitutional error cannot be combined to create reversible error. *United States v. Moye*, 951 F.2d 59, 63 n. 7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of cumulative error must also fail."). "Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Derden*, 978 F.2d at 1461).

As discussed throughout this opinion, Petitioner has not shown a violation of his constitutional rights. None of Petitioner's complaints about the performance of his trial counsel satisfy either prong of the *Strickland* analysis. Therefore, there is no error for this Court to cumulate. *United States v. Thomas*, 724 F.3d 632, 648 (5th Cir. 2013) ("[T]here is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in *Strickland*."); *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Twenty times zero equals zero."). Even assuming Petitioner had established some sort of trial court error, federal habeas relief would not be warranted because the cumulative error doctrine provides habeas relief only where the

constitutional errors committed in the state court so fatally infected the trial that they violate the trial's fundamental fairness. *Derden*, 938 F.2d at 609. Again, Petitioner has not made this showing. As such, his cumulative-error claim is denied.

## V.  Request for Evidentiary Hearing

In his amended petition and again in his reply, Petitioner requests an evidentiary hearing to resolve "several disputes of material fact" concerning the effectiveness of both his trial and state habeas counsel, as well as the treatment he received as a juvenile while in TYC custody. Under the AEDPA, the proper place for development of the facts supporting a claim is the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court). Thus, to the extent Petitioner wishes to develop new evidence to attack the resolution of claims adjudicated in state court, his request is denied because such factual development is effectively precluded in federal court under *Pinholster*. 563 U.S. at 181-82 ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."); *Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) (same).

Petitioner's request for factual development of his unexhausted claims is similarly unpersuasive. Whenever an applicant fails "to develop the factual basis of a claim" in state court, § 2254(e)(2) limits the introduction of new evidence at an evidentiary hearing. *Pinholster*, 563 U.S. at 185-86. Contrary to Petitioner's assertion (ECF No. 22 at 23), he clearly failed to develop the factual basis of his unexhausted claims in state court. Consequently, an evidentiary hearing is permissible only where (1) there is a new, retroactive rule of constitutional law, or (2) the facts could not have been discovered with due diligence and such facts demonstrate actual

innocence of the crime by clear and convincing evidence. 28 U.S.C. § 2254(e)(2)(A)–(B). Petitioner fails to make either of these showings. Instead, he contends a hearing is necessary to help him establish cause and prejudice under *Martinez* and *Trevino* to overcome the procedural default of his unexhausted claims. Neither case entitles him to a hearing. *See Segundo v. Davis*, 831 F.3d 345, 351 (5th Cir. 2016) ("[W]e decline to hold that *Martinez* mandates an opportunity for additional fact-finding in support of cause and prejudice.").[16]

Regardless, even if Petitioner were not barred from obtaining an evidentiary hearing by § 2254(e)(2), the decision to grant such a hearing "rests in the discretion of the district court." *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro v. Landrigan,* 550 U.S. 465, 468 (2007)). In making this determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Richards*, 566 F.3d at 563 (*quoting Schriro*, 550 U.S. at 474); *Blue*, 665 F.3d at 655. A district court may also deny a hearing if the record is sufficiently developed to make an informed decision. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

Further factual development in this case is unwarranted because all of Petitioner's claims lack merit on their face. *See Register v. Thaler*, 681 F.3d 623, 627-30 (5th Cir. 2012) (recognizing the discretion inherent in district courts to allow factual development, especially when confronted with claims foreclosed by applicable legal authority). As demonstrated herein, each of Petitioner's claims can be resolved on the merits by reference to the state court record, the submissions of the parties, and relevant legal authority. There is therefore no basis upon

---

[16] Indeed, "reading *Martinez* to create an affirmative right to an evidentiary hearing would effectively guarantee a hearing for every petitioner who raises an unexhausted IATC claim and argues that *Martinez* applies." *Id*.

which to hold an evidentiary hearing.  *See Schriro*, 550 U.S. at 474 (recognizing that "an evidentiary hearing is not required on issues that can be resolved by reference to the state court record") (citation omitted).

## VI.  Certificate of Appealability

The Court must now determine whether to issue a certificate of appealability (COA).  *See* Rule 11(a) of the Rules Governing § 2254 Proceedings; *Miller–El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).  A district court may deny a COA *sua sponte* without requiring further briefing or argument.  *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000).  But a COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requires Petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).

The Supreme Court has explained that the showing required under § 2253(c)(2) is straightforward when a district court has rejected a petitioner's constitutional claims on the merits:  The petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  The issue becomes somewhat more complicated when the district court denies relief on procedural grounds.  *Id*.  In that case, the petitioner seeking COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012) (citing *Slack,* 529 U.S. at 484). Whatever the basis for the denial, however, the court must bear in mind

that "[w]here the petitioner faces the death penalty, 'any doubts as to whether a COA should issue must be resolved' in the petitioner's favor.'" *Allen v. Stephens*, 805 F.3d 617, 625 (5th Cir. 2015) (quoting *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004)), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018).

In this case, Petitioner has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor could reasonable jurists debate the denial of federal habeas corpus relief on either substantive or procedural grounds, or find that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, Petitioner is not entitled to a COA.

## VII. <u>Conclusion and Order</u>

The Court has thoroughly reviewed the extensive record and pleadings submitted by both parties in this case, as well as the 1,000-plus pages of exhibits submitted on Petitioner's behalf (ECF Nos. 14, 23). After careful consideration, the Court concludes that the majority of Petitioner's allegations (claims 2, 3, 5, 6, 9, 10, 14(b)(2), 14(c), and 15) are unexhausted and thus procedurally barred from federal habeas relief.[17] Alternatively, even when evaluated under a *de novo* standard of review, these claims do not warrant relief because they also lack merit.

For the remainder of Petitioner's claims that were properly exhausted during Petitioner's state court proceedings (claims 1, 4, 7, 8, 11-13, 14(a), and 14(b)(1)), Petitioner has failed to establish that the state court's rejection of the claims on the merits was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state trial, appellate, and habeas corpus

---

[17]     As discussed herein, certain portions of claims 1, 7, 8, and 12 are also unexhausted, making those portions procedurally barred from federal habeas relief as well.

proceedings. Claims 14(b)(2) and 14(c) also do not warrant relief because they are barred by the limitations period set forth in 28 U.S.C. § 2244(d)(1).

In short, Petitioner's amended federal habeas corpus petition does not warrant federal habeas corpus relief. Accordingly, based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Federal habeas corpus relief is **DENIED** and Petitioner Joe Michael Luna's Amended Petition for Writ of Habeas Corpus (ECF No. 22) is **DISMISSED WITH PREJUDICE**;

2. No Certificate of Appealability shall issue in this case; and

3. All other remaining motions, if any, are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

SIGNED this 24th day of September, 2018.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE